(No. 89061.—

*In re* D.D., a Minor (The People of the State of Illinois, Appellee, v. M.D., Appellant).

*Opinion filed June 21, 2001.*

HARRISON, C.J., dissenting.

Phyllis J. Perko, of the Law Offices of Harlovic & Perko, of West Dundee, for appellant.

James E. Ryan, Attorney General, of Springfield, and David R. Akemann, State's Attorney, of St. Charles (Joel D. Bertocchi, Solicitor General, and William L. Browers and Michael M. Glick, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

On April 23, 1999, the circuit court of Kane County issued an order terminating M.D.'s parental rights to his son, D.D., after finding M.D. to be an unfit parent pursuant to sections 1(D)(m) and 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(m), (D)(s) (West 1998)). The order was affirmed by the appellate court on appeal. 309 Ill. App. 3d 581. This court granted M.D.'s petition for leave to appeal. 177 Ill. 2d R. 315(a). For the reasons that follow, we now affirm.

## BACKGROUND

On July 18, 1996, Copley Hospital notified the Department of Children and Family Services (DCFS) that on July 17, 1996, Penny Warren (Warren) gave birth to a son, D.D., who had been exposed to cocaine. A DCFS Division of Child Protection (DCP) investigator went to Copley Hospital and spoke with Warren, offering her services and drug treatment. Warren refused the offer of services and informed the investigator that she planned to give D.D. to Elizabeth Washington (Washington), a woman whom she had met two months earlier. After the investigator's visit, Warren had no further contact with DCFS. Warren left Copley Hospital and disappeared. Despite diligent searches, DCFS was unable to locate her.

D.D. was taken into protective custody by DCFS and, on July 23, 1996, DCFS filed a petition for adjudication of wardship on the basis that D.D. was abused and neglected. See 705 ILCS 405/2—13 (West 1996). The petition alleged that D.D. was neglected "in that he was born with cocaine in his urine which is not a result of medical treatment administered to the mother or infant," and abused "in that his mother created a substantial risk of physical injury to [D.D.] when she was pregnant; to wit: the mother was taking cocaine or ingesting cocaine while

pregnant."[1] The petition listed D.D.'s father as "unknown."

Shortly after the petition was filed, DCFS was contacted by M.D., who identified himself as D.D.'s putative father. M.D. requested a blood test to establish paternity and notified DCFS that, if he was D.D's father, he wanted D.D. placed with Washington, whom he identified as his fiancée. M.D. was unable to take custody of D.D. himself, however, because he was being held in the Kane County jail, awaiting trial on charges of home invasion and armed violence.

On August 12, 1996, M.D. appeared before the court, acknowledged paternity for D.D., and stipulated to the State's neglect petition, admitting that D.D. was a neglected minor because he had been born with cocaine in his system. The court declined, at that time, to remove D.D. from the care and custody of DCFS. The court ordered shelter care to continue pending the completion of a home study on Washington. The court also directed DCFS to determine whether any blood relatives were willing and able to care for D.D.

On September 17, 1996, DCFS filed a court report indicating that it had been in contact with Paulette D., D.D.'s paternal grandmother, and June S., D.D.'s maternal grandmother, and learned that there were no relatives available to care for D.D.

On December 17, 1996, Washington married M.D. at the Kane County jail. Shortly thereafter, on December 23, 1996, M.D. was tried and found guilty of home invasion and armed violence (predicated on aggravated battery causing great bodily harm). He was sentenced to a term of 10 years' imprisonment for the armed violence

---

[1]On December 20, 1996, a default judgment of abuse and neglect as to D.D. was entered against Warren and, on April 23, 1999, Warren's parental rights were terminated. The termination of Warren's parental rights is not contested in this appeal.

conviction, with a concurrent term of 6 years' imprisonment for the home invasion conviction.

On January 6, 1997, M.D. and his now-wife, Washington, petitioned the court to set aside the adjudication of neglect and all previous shelter care orders and have D.D. placed in the guardianship and custody of Washington.

On January 10, 1997, DCFS filed with the court its completed home study and investigation of Washington. According to the report, the physical environment of Washington's home was adequate, but Washington was unqualified to become a registered foster care provider under DCFS standards due to her extensive criminal history.[2]

On January 14, 1997, the court denied M.D.'s petition to set aside the adjudication and shelter care orders. However, M.D. was given leave to file a new motion for change of custody and guardianship. M.D. filed this motion on March 10, 1997. Evidentiary hearings were held on May 29 and June 27, 1997, and the motion was denied.

In July 1997, at an administrative case review, DCFS changed the permanency goal for D.D. to substitute care pending the filing of a termination petition. The case passed legal screening in September 1997 and was referred to the State's Attorney for the filing of a termination petition.

On March 9, 1998, the State filed a petition for the termination of M.D.'s parental rights. Five grounds for finding M.D. unfit were alleged: (a) failure to maintain a reasonable degree of interest, concern, or responsibility;

---

[2]Between October 1969 and July 1987, Washington was arrested 15 times, mostly on charges of forgery, deceptive practices, and theft. The record reveals that Washington has two convictions—one in 1970, for aggravated assault, and one in 1981, for felony forgery and theft—and served time on both convictions. Washington's most recent arrest was in 1987, on a charge of aggravated battery.

(b) failure to make reasonable efforts to correct the conditions which were the basis for removal and/or failure to make reasonable progress toward the return of D.D. within 12 months of adjudication; (c) desertion; (d) incarceration which prevents the discharge of parental duties for a period in excess of two years, accompanied by little or no previous contact and/or little or no support; and (e) repeated incarceration as a result of criminal convictions, which has prevented the discharge of parental duties. See 750 ILCS 50/1(D)(b), (D)(c), (D)(m), (D)(r), (D)(s) (West 1998).

Hearing on the petition was initially set for July 9, 1998. However, on that date, M.D. filed a motion seeking a substitution of judges. After a number of continuances, the motion was heard and granted on October 7, 1998. After several more continuances, evidentiary hearings on the termination petition were held on March 25 and 26, 1999.

In addition to the background evidence set forth above, the court received testimonial and documentary evidence, which revealed the following.

When D.D. was born on July 17, 1996, M.D. was in jail awaiting trial on charges of armed violence and home invasion. After a trial on December 23, 1996, M.D. was found guilty as charged after it was shown that, on June 22, 1996, he entered the home of Jeffrey Martin without permission and stabbed Martin with a knife. M.D. was sentenced to concurrent terms of 10 years and 6 years, respectively. Darlene Bridge, the record office supervisor at Sheridan Correctional Center (Sheridan), testified that M.D. was incarcerated and serving his sentences at Sheridan. According to her most recent calculations, M.D. was scheduled to be released on June 24, 2001.

DCFS records showed that, due to M.D.'s incarceration, M.D.'s opportunity to interact with D.D. was extremely limited. Between July 1996 and March 1997,

M.D.'s only contact with D.D. occurred at the courthouse, on the few occasions when M.D. was brought from jail to attend court hearings regarding D.D.'s care and custody.

After M.D. was convicted and moved to Sheridan, a visitation schedule was established. Beginning March 11, 1997, a case aide brought D.D. to Sheridan once each month for a scheduled one-hour supervised visitation. Visits at Sheridan took place in a large, cafeteria-like room where other inmates and their guests also were present. Before a visitation began, there often was a long wait while everyone was searched and processed. The visits generally did not last the full hour because D.D. did not react well to the surroundings and typically spent most of the visit crying. According to the case aide who supervised the visits, M.D. was unable to engage D.D. or develop any bond with him.

Visitations also were sporadic. No visit took place in October 1997 because the prison was in lockdown. At the November 1997 visit, M.D., citing a concern for D.D.'s health, asked that visitation be suspended. Visitations did not resume until May 1998.

After the May 20, 1998, and June 24, 1998, visits, the foster mother and the case aide reported to DCFS worker Rachel Weiss[3] that they were concerned about D.D.'s traumatic reaction to the renewed visitation. It was reported that D.D. would work himself up into such a state that they feared for his safety. While crying heavily, D.D. would put his fist in his mouth and gag himself. D.D. refused all physical contact with M.D. and would not even look at him. M.D., the aide said, appeared unmoved by D.D.'s distress and incapable of taking any action to correct it.

Because of the reported difficulties, Weiss decided to

---

[3]Rachel Weiss took over as D.D.'s caseworker in February 1998, when the previous worker, Charles Moon, moved to a different DCFS field office.

personally supervise the next few visits. Weiss accompanied D.D. and the foster mother to Sheridan on July 22, 1998, but no visit took place. When M.D. saw that Weiss was present, he refused visitation. Weiss immediately contacted M.D. by letter, explaining that she would be personally supervising visitation for assessment purposes. However, after Weiss traveled to Sheridan with D.D. and the foster mother for the next scheduled visit on September 11, 1998, M.D. again refused visitation.

A court hearing was held on September 16, 1998, at which time visitation problems were discussed. In the course of this hearing, M.D. made threatening statements toward Weiss in front of the judge.[4] The judge admonished M.D. regarding his behavior and directed M.D. to cooperate with Weiss, whose job it was to supervise visitation if she felt there was a need. Despite these admonishments, M.D. elected to cancel the next scheduled visitation.

M.D. did not have another visit with D.D. until November 12, 1998. On this occasion both foster parents accompanied D.D. to Sheridan. Weiss supervised the visit and observed M.D.'s interaction with D.D., who continued to cry and refuse all contact with M.D. During this visit, M.D. spent much of the time speaking to the foster father, attempting to negotiate an agreement. M.D. indicated that he would be willing to voluntarily surrender D.D. for adoption if the foster parents would sign an agreement to allow him to visit. In the course of the conversation, M.D. made a remark about knowing the foster parents' address. This remark was perceived by the foster parents as a subtle threat.

The next visit, on December 8, 1998, proceeded much the same way—D.D. refused to interact with M.D. In the absence of the foster father, M.D. tried to discuss his earlier proposal with the foster mother. Weiss interceded

---

[4]M.D. told Weiss she should have her "teeth kicked down her throat" because, he alleged, she had "disrespected" his mother.

and told M.D. that no agreement would be made. Weiss then noticed M.D. gesturing to another inmate. Weiss found this nonverbal communication with another inmate to be threatening and inappropriate. As a result, the visit was terminated.

In 1999, visitation was limited, by court order, to half-hour visits. Visits took place in January and March, but not in February. The February visit was canceled by M.D. because he believed he was being moved from Sheridan.

The State also presented evidence pertaining to M.D.'s compliance with the service plans developed by DCFS. The service plans, which had been discussed with and agreed to by M.D., recommended that M.D. participate in various services, including substance abuse counseling, anger management classes, parenting classes, and psychological testing and counseling. Steven Stocker, a Sheridan casework supervisor, testified that some of the services recommended by DCFS, though available at Sheridan, had been unavailable to M.D. because of his advanced release date. There were other services, however, which were available to M.D., although he never participated in them. Stocker testified that anger management classes were available and had been recommended since January 1997, but M.D. never signed up for them. Cooperative work training, a course that teaches life skills, including parenting, also was available to M.D. He did not register for this class until January 1999, just two months before the termination hearings were held.

The court admitted into evidence State's Exhibits 8 and 9, which contained records of M.D.'s two prior criminal convictions. According to these exhibits, M.D. had been charged by indictment on December 11, 1984, with three counts of murder in relation to the December 9, 1984, stabbing death of Edward Ortega. M.D. also was

charged with one count of attempted murder in relation to the December 9, 1984, stabbing of Juan Galindo. M.D. pleaded guilty to attempted murder in exchange for a dismissal of the murder charges. A sentence of 12 years' imprisonment was imposed. The exhibits also revealed that M.D. was charged on June 11, 1991, with two counts of attempted murder, one count of home invasion, and two counts of aggravated discharge of a firearm. The indictments alleged that on May 23, 1991, M.D., while armed with a gun, entered the home of Dorothy Yager without permission. While inside the home, M.D. fired the gun in the direction of James and Dennis Pendall in an attempt to kill or do great bodily harm to them. On July 13, 1992, M.D. pleaded guilty to one count of aggravated discharge of a firearm in exchange for an agreement to have the remaining charges nol-prossed. A sentence of seven years' imprisonment was imposed.

At the close of the State's evidence, the circuit court judge granted M.D. a directed verdict on two of the unfitness grounds alleged in the petition—failure to make reasonable efforts (750 ILCS 50/1(D)(m) (West 1998)) and desertion (750 ILCS 50/1(D)(c) (West 1998)). M.D. then presented the testimony of Paulette, his mother, and Washington, his wife. Only his wife's testimony is relevant here.

Washington testified that she had known M.D. for about 18 months before they were married in December 1996. In the fall of 1995, shortly after they met, M.D. introduced her to Warren, who was pregnant with M.D.'s baby. Washington said M.D. introduced her to Warren because she (Washington) wanted a child, but could not have any of her own, and Warren was looking for someone to "take over the baby when it was born." According to Washington, after they met, Warren agreed to allow Washington to adopt the baby. No legal steps were taken to finalize the agreement, however. Washington said that

M.D. gave her money toward the purchase of a crib, clothes, and other items and promised to contribute financial assistance for the baby in the future.

Washington also testified that she found M.D. to have a "mellow" and "good-natured" temperament. She said she had never seen him violent and he has never been angry with her. Although M.D. told her about his previous attempted murder conviction, she did not know about his conviction for aggravated discharge of a firearm. However, Washington said, she did not hold a person's past against him and judged a person by the way he treated her.

After all of the evidence was received, the court ruled M.D. unfit pursuant to section 1(D)(m) (failure to make reasonable progress toward the return of the child) and section 1(D)(s) (repeated incarceration). 750 ILCS 50/1(D)(m), (D)(s) (West 1998).

On April 20, 1999, the court conducted a best interests hearing and determined it was in D.D.'s best interests to terminate M.D.'s parental rights. An order terminating M.D.'s parental rights and authorizing the Guardianship Administrator to consent to D.D.'s adoption was issued on April 23, 1999. See 705 ILCS 405/2—29 (West 1998). As noted earlier, this order was affirmed on appeal to the appellate court. This court granted M.D.'s petition for leave to appeal (177 Ill. 2d R. 315).

## ANALYSIS

The Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 1998)) is a comprehensive statutory scheme which creates rights and duties that have no counterparts in common law or equity. *In re M.M.*, 156 Ill. 2d 53, 65 (1993). In Illinois, when a court conducts proceedings to involuntarily terminate parental rights, its authority is statutorily derived and the scope and application of these proceedings are defined solely by the legislature. *In re*

*M.M.*, 156 Ill. 2d at 63-66; *In re S.B.*, 305 Ill. App. 3d 813, 817 (1999); *In re M.V.*, 288 Ill. App. 3d 300, 304 (1997). A proceeding to involuntarily terminate parental rights is a drastic measure which determines whether, under our laws, a person should continue to hold the legal status of parent or have "the entire bundle of parental rights, custodial and noncustodial," forever removed. *In re S.W.*, 315 Ill. App. 3d 1153, 1157 (2000); see also *In re D.R.*, 307 Ill. App. 3d 478, 482 (1999).

Parental termination proceedings are initiated by the filing of a petition pursuant to section 2—29(2) of the Juvenile Court Act (705 ILCS 405/2—29(2) (West 1998)). Section 2—29 provides that a parent's rights may be terminated upon proof, by clear and convincing evidence, that the parent is unfit, as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1998)). When deciding a parent's fitness, the court is not to consider the best interests of the child but, rather, must focus on whether the parent's conduct falls within one or more of the several "grounds of unfitness" described in section 1(D) of the Adoption Act. *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990). A court's determination that clear and convincing evidence of a parent's unfitness has been shown will not be disturbed on review unless it is against the manifest weight of the evidence. *In re D.L.*, 191 Ill. 2d 1, 13 (2000); *In re A.S.B.*, 293 Ill. App. 3d 836, 843 (1997). A decision regarding parental fitness is against the manifest weight of the evidence where the opposite conclusion is clearly the proper result. *In re T.B.*, 215 Ill. App. 3d 1059, 1062 (1991).

Unfitness Pursuant to Section 1(D)(s)

Section 1(D)(s) of the Adoption Act provides that a parent may be found unfit if:

"The child is in the temporary custody or guardianship of the Department of Children and Family Services, the parent is incarcerated at the time the petition or motion

for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 1998).

The ground of a parent's repeated conviction and incarceration was added only recently to the definition of "unfit person" in section 1(D) of the Adoption Act. See Pub. Act 90—28, eff. January 1, 1998. For this reason, it has not yet been construed by this court.

In the case at bar, M.D. challenges the circuit and appellate courts' interpretation and application of this unfitness ground under the circumstances of this case. The dispute centers on the final phrases of the provision, "the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." M.D. contends that these phrases, properly interpreted, provide that a parent may be found unfit only when it can be shown that the parent was unable to fulfill his or her parental duties as a result of being repeatedly unavailable, during the lifetime of the child, due to incarceration. Because, in this case, M.D. was incarcerated only once during D.D.'s lifetime, M.D. argues that the provision does not apply to him. We disagree.

Whether the trial and appellate courts have correctly interpreted this statutory provision is a question of law and, accordingly, our review is *de novo*. See *In re Application of the Cook County Treasurer*, 185 Ill. 2d 428 (1998). The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature (*People v. Latona*, 184 Ill. 2d 260, 269 (1998); *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 83 (1994); *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990)), while presuming the legislature did not

intend to create absurdity, inconvenience, or injustice (*Henrich v. Libertyville High School*, 186 Ill. 2d 381, 394 (1998)). When determining legislative intent, the starting point always is the language of the statute, which is the most reliable indicator of the legislature's objectives in enacting the particular law. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493 (2000); *Nottage v. Jeka*, 172 Ill. 2d 386, 392 (1996). When the language of a statute is plain and unambiguous, courts may not read in exceptions, limitations, or other conditions. *People v. Lavallier*, 187 Ill. 2d 464 (1999); *People v. Daniels*, 172 Ill. 2d 154, 163 (1996). Only when the meaning of the enactment cannot be ascertained from the language may a court look beyond the language and resort to aids for construction. *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 475 (1998); *Solich*, 158 Ill. 2d at 81.

Applying the principles and standards above, we find the language of section 1(D)(s) to be clear and unambiguous. Nowhere do we find a requirement that the repeated incarceration take place during the lifetime of the child. Nor would insertion of such a limiting condition be consistent with the "reason and necessity for the law, the evils to be remedied, and the objectives to be obtained." *Cummins v. Country Mutual Insurance Co.*, 178 Ill. 2d 474, 479 (1997); accord *People v. Bole*, 155 Ill. 2d 188, 195 (1993).

Section 1(D)(s) is contained within the Adoption Act and sets forth one of the grounds for finding a parent unfit. This ground may then be used as the basis for terminating a parent's rights pursuant to section 2—29 of the Juvenile Court Act. Our construction of this provision, therefore, must take into account the nature and purpose of the Juvenile Court Act. See *In re K.B.J.*, 305 Ill. App. 3d 917 (1999). The stated purpose of the Juvenile Court Act is to "secure for each minor subject hereto

such care and guidance \*\*\* as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal \*\*\*." 705 ILCS 405/1—2(1) (West 1998). Applying the plain language of the provision, without the addition of the limiting language proposed by M.D., is consistent with the stated purpose of the Act, and so we apply the provision as written.

Section 1(D)(s), no doubt, is applicable in situations where the parent, during the lifetime of the child, has had recurring absences caused by incarcerations which have prevented the parent from providing his or her child with a stable home environment. See *In re M.M.J.*, 313 Ill. App. 3d 352 (2000); *In re Sheltanya S.*, 309 Ill. App. 3d 941 (1999). However, the plain language of the provision allows for a broader application. We note, as the trial court did, that the final phrase of section 1(D)(s) uses the term "repeated incarceration," not "repeated incarcerations." Though this may seem a minor distinction, we find the legislature's use of the singular form to be both deliberate and significant.

The plural form has a more narrow connotation. Had the legislature used the plural form, stating "the parent's *repeated incarcerations* have prevented the parent from discharging his or her parental responsibilities for the child," the specific reference would be to the incarcerations themselves. A parent's unfitness would stem from these incarcerations—these absences—which prevent the parent from discharging his or her parental duties.

The singular term, however, has a broader connotation. By using the singular form, stating "the parent's *repeated incarceration* has prevented the parent from

discharging his or her parental responsibilities for the child," the legislature makes reference to the general inclusive concept of "repeated incarceration," suggesting that courts may consider the overall impact that repeated incarceration may have on the parent's ability to discharge his or her parental responsibilities—circumstances which may flow from the fact of repeated incarceration, such as the diminished capacity to provide financial, physical, and emotional support for the child.

The facts of this case provide a representative example. The record reveals that M.D. was just 21 years old when, on December 9, 1984, he stabbed a person with a knife. After pleading guilty to a charge of attempted murder, he was sentenced to 12 years' imprisonment. M.D. could not have been out of prison long when, on May 23, 1991, he committed acts which resulted in his conviction for aggravated battery and was sentenced to a term of seven years' imprisonment. Then, soon after his release from prison the second time and while aware that Warren was pregnant with his child, M.D. was arrested on charges of home invasion and armed violence. He was found guilty and imprisoned on concurrent sentences of 6 and 10 years' imprisonment respectively.

To date, M.D. has been imprisoned nearly all of his adult life. He has acquired no appropriate life skills. Furthermore, his repeated incarceration demonstrates an inability to conform to societal norms. Even after becoming aware that he had fathered a child, M.D. committed acts, shortly before the baby was due, which caused him to be incarcerated at the time of the child's birth. Since D.D.'s birth, there has been no indication that M.D. has been able to form any bond with D.D. M.D. has demonstrated no real interest or ability in meeting any of D.D.'s needs, whether they be physical, mental, material, or emotional. We conclude that M.D. has been prevented, not only by his present incarceration, but as a

result of his repeated incarceration, from discharging his parental responsibilities.

While M.D.'s present incarceration has precluded him from providing for D.D's physical and material needs for the entirety of D.D.'s lifetime, the cumulative effect of M.D.'s repeated incarceration has rendered him incapable of meeting D.D.'s moral, mental, and emotional needs.

Of course, in cases involving the termination of parental rights, each case is *sui generis* and must be decided based on the particular facts and circumstances presented. *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). In the present case M.D. has been shown to be unfit pursuant to the plain language of section 1(D)(s) because the evidence clearly and convincingly establishes that M.D.'s repeated incarceration has prevented him from discharging his parental responsibilities to D.D. Under different circumstances, a parent's repeated incarceration, whether during the lifetime of the child or not, may not prevent the parent from discharging his or her parental duties and, therefore, would not establish that parent's unfitness.

For the reasons stated, we find that the circuit and appellate courts' interpretation of section 1(D)(s) was proper and their determination that clear and convincing evidence established M.D.'s unfitness pursuant to section 1(D)(s) was not against the manifest weight of the evidence. Furthermore, because parental rights may be terminated upon proof, by clear and convincing evidence, of a single ground for unfitness (*In re D.L.*, 191 Ill. 2d 1, 8 (2000); *In re M.S.*, 302 Ill. App. 3d 998, 1002 (1999)), we need not consider here whether M.D. also was unfit because he failed to make reasonable progress pursuant to section 1(D)(m).

## CONCLUSION

The appellate court's judgment affirming the trial court's order terminating M.D.'s parental rights is hereby affirmed.

*Affirmed.*

CHIEF JUSTICE HARRISON, dissenting:

If section 1(D)(s) of the Adoption Act is applied as written, it cannot serve as the basis for terminating M.D.'s parental rights. Section 1(D)(s) of the Act and section 1(D)(r), which precedes it, address the impact of parents' incarceration on their present ability to fulfill their parental duties. Where a parent is incarcerated, he or she previously had little or no contact with the child or provided little or no support, and the term of confinement is so lengthy that the parent will not be able to discharge his parental responsibilities for a period in excess of two years, a finding of unfitness can be sought under section 1(D)(r) of the Adoption Act.

Where the parent is faced with a shorter period of incarceration, section 1(D)(r) is inapplicable. If the incarcerated parent has been in jail or prison before, however, the cumulative effect of the multiple but shorter incarcerations may be as deleterious to the parent's parenting abilities as a single long jail sentence. Repeated absences due to jail confinement are scarcely conducive to the exercise of child-rearing obligations. A parent who has been jailed again and again for less serious offenses may therefore be no more fit than a parent who has only been convicted once but for a more serious crime.

The purpose of section 1(D)(s) is to address this situation. It recognizes that the length of a parent's present prison term is not dispositive. It eliminates any disparity by treating chronic minor offenders the same as those who have offended less often but more seriously.

Section 1(D)(r) of the Act plainly requires the parent's incarceration to occur while the child is alive. In

eliminating the disparity between parents serving longer sentences and those serving multiple shorter sentences, section 1(D)(s) does not alter this requirement. As I have just indicated, the chief distinction between parents subject to section 1(D)(s) and those subject to section 1(D)(r) is simply the duration of their incarceration. Nothing in section 1(D)(s) gives the court additional authorization to look back and assess events which occurred before an individual even became a parent.

Consider again what the statute actually says. Under section 1(D)(s), the repeated incarceration must have prevented the parent from discharging his or her parental responsibilities. Until a child is born, however, there is no way for a parent's conduct to interfere with his or her discharge of parental responsibilities because there are no such responsibilities to discharge. For purposes of evaluating fitness, the responsibilities of parenthood commence with a child's birth.

Before an individual actually has children, the only effect incarceration can have in terms of parenting is to handicap the individual's ability to develop parental skills for use in the future. While I do not question that a person confined to jail or prison on a regular basis will have a more difficult time acquiring the life skills needed to be an effective parent, that is simply not the issue. In applying section 1(D)(s), we must look to the language employed by the legislature, and nothing in the language of the statute makes failure to develop parenting ability before the child was born a basis for a finding of lack of fitness now. What matters under the law is whether recurring confinement has had an adverse effect on the parent's actual parenting activities since the child's birth.

For the foregoing reasons, I agree with M.D.'s contention that in order for repeated incarceration to have prevented the discharging of parental responsibilities within the meaning of section 1(D)(s), that incarceration

must have occurred during the child's lifetime. In the case before us, M.D. had not been repeatedly incarcerated during his child's life. He was only incarcerated once. As a result, section 1(D)(s) could not serve as the basis for terminating M.D.'s parental rights. I therefore believe that it was incumbent on this court to consider the additional question of whether M.D. was properly found unfit on the alternative ground that he failed to make reasonable progress pursuant to section 1(D)(m) of the Adoption Act. Accordingly, I dissent.