(No. 98131.—

*In re* GWYNNE P., a Minor (The People of the State of Illinois, Appellee, v. Detra W., Appellant).

*Opinion filed May 19, 2005.*

Donna L. Ryder, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Kisicki and Nancy Faulls, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Charles P. Golbert and Christopher Williams, of the Office of the Cook County Public Guardian, of Chicago, for the minor.

Michael A. Pollard, Steven Dixon and Angela C. Vigil, of Baker & McKenzie, L.L.P., of Chicago (Thomas R.

Gerety and Kirsten D. Levingston, of New York, New York, of counsel), for *amici curiae* Chicago Legal Advocacy for Incarcerated Mothers *et al.*

JUSTICE KARMEIER* delivered the opinion of the court:

Gwynne P., a minor, has been a ward of the state since shortly after her birth. When Gwynne was just over a year and a half old, the State petitioned the circuit court of Cook County to terminate the parental rights of her biological parents and to appoint a guardian with the right to consent to her adoption. Following the requisite hearings, the State's petition was allowed. Both biological parents appealed. The appellate court affirmed. 346 Ill. App. 3d 584. We granted the biological mother's petition for leave to appeal. 177 Ill. 2d R. 315. For the reasons that follow, we now affirm the judgment of the appellate court.

Gwynne was born June 18, 1999. At the time, both of her biological parents were incarcerated. This was not a novel circumstance for either of them. By June of 1999, Gwynne's father, Edward Davis, had amassed a significant criminal record, including felony convictions for theft, burglary, aggravated battery, possession of a controlled substance with intent to deliver, and retail theft. Edward was in jail awaiting trial on an additional felony theft charge when Gwynne's mother gave birth to her. He was convicted of that offense the following month and sentenced to 15 years in the Department of Corrections. He began serving that sentence on September 3, 1999.

Gwynne's mother, Detra Welch, also sometimes known as Jodia (or Jodi or Jody) McMullen, also some-

---

*Justice Karmeier succeeded Justice Rarick in office after this case was taken under advisement. He has reviewed the record, the briefs and the audio recordings of the oral argument.

times known as Melissa P., also sometimes known as Latonya Reed, was convicted of retail theft and sentenced to 18 months' probation in 1992. She was subsequently found to have violated the terms of her probation and sentenced to 120 days in the Cook County Department of Corrections. In 1997, she pleaded guilty to unlawful delivery of a controlled substance and was sentenced to three years in the Illinois Department of Corrections. She also pleaded guilty to a new charge of retail theft for which she was sentenced to an additional year in the Department of Corrections.

Shortly after Detra began serving the sentences imposed for her 1997 convictions, she was transferred to a work release program in Chicago. While participating in that program, Detra escaped from custody by breaking her electronic monitoring device. She remained at large until June 15, 1999, three days before Gwynne's birth, when she was arrested on new drug charges.

On the eve of Gwynne's birth, Detra was indicted for unlawful possession of a controlled substance with intent to deliver and multiple other drug offenses. Detra was subsequently transported from the Cook County jail, where she was being held, to the West Suburban Hospital, where she gave birth to Gywnne. A long-term drug abuser, Detra transmitted her affliction to her new baby daughter *in utero*. Drug tests administered to Gwynne shortly after her birth disclosed the presence of cocaine and opiates in her system. Gwynne began experiencing heavy drug withdrawal symptoms for which she required medication. She was later diagnosed with severe developmental deficits attributable to her mother's illegal drug use.

Detra's contact with her new baby was short-lived. On June 21, 1999, Detra was released from the hospital and taken back to the Cook County jail. Soon thereafter, she pleaded guilty and was sentenced to four years in the

Illinois Department of Corrections for unlawful possession of a controlled substance with intent to deliver, one of the new offenses charged in the June 1999 indictment. That conviction resulted in Detra's return to the Department of Corrections on August 11, 1999.

Detra had numerous problems while in prison. Between 1997 and the end of November 2001, she received a total of 12 inmate disciplinary reports. Most arose from minor rule infractions. Some were more serious, however, and resulted in her being placed in segregation. The most significant punishment arose from her escape in 1998. As a result of that escape, Detra lost a year of good-time credits, received a C grade classification, and was segregated from the prison's general population for a full year. The period of disciplinary segregation encompassed most of the first year of Gwynne's life and carried over into her second. Detra was eventually released from the Department of Corrections in March of 2002, three months before Gwynne's third birthday.

Gwynne is not Detra's only child. She has three other offspring, Judia, now 21; George, now 19; and Sade, now 18. Those three children were sent to live with relatives in Wisconsin when Detra began serving her prison sentences for her 1997 drug and theft convictions. The record indicates that Judia and Sade remained there without incident. George did not.

After his mother was sent to prison, George lived briefly with his maternal grandmother in Milwaukee. He soon left there to return to Chicago, where he stayed with his maternal uncle, Detra's brother. The uncle beat George, made him sleep on the floor, and forced him to watch the uncle and the uncle's male paramour engage in sexual intercourse. Eventually the situation was brought to the attention of authorities, who removed George from the uncle's home and placed him in a shelter.

The State was granted temporary custody of George on December 18, 1997, and placed him with his maternal aunt. George apparently remained there until July of 1999, when he fled the State. His whereabouts remained unknown until October of 2000, when a DCFS worker discovered that he had gone back to stay with his maternal grandmother in Milwaukee.

While Detra was released from the hospital on June 21, 1999, Gwynne remained there until July 1, 1999, when she was admitted to the Maryville Center for Medically Complex Children. In the interim, DCFS was granted temporary custody of the child. On June 29, 1999, when Gwynne was 11 days old, the State petitioned the circuit court of Cook County pursuant to the Juvenile Court Act of 1987 (705 ILCS 405/1—1 et seq. (West 2002)) to make her a ward of the court.

After providing notice to the biological parents, the court conducted a temporary custody hearing pursuant to section 2—10 of the Juvenile Court Act (705 ILCS 405/2—10 (West 2002)). Based on that hearing, the court determined that probable cause existed to believe that Gwynne was neglected, abused and dependent; that there was an immediate and urgent necessity to remove the child from her parents' home; and that no efforts could reasonably be made at that time to prevent or eliminate the necessity for removing the child from the home. The court therefore ordered that Gwynne be removed from the home and granted DCFS temporary custody of her.[1]

The circuit court entered its order placing Gwynne in temporary custody on July 9, 1999. An adjudicatory hearing was subsequently held at which the court found that Gwynne was a neglected or abused minor within the

---

[1]Removal of Gwynne from her parents' home was, of course, a legal fiction. At the time Gwynne was born, her parents had no "home" in any meaningful sense and Gwynne has never resided with either of them.

meaning of section 2—3 of the Juvenile Court Act of 1987 (705 ILCS 405/2—3 (West 2002)) because her environment was injurious to her welfare (705 ILCS 405/2—3(1)(b) (West 2002)), because she had controlled substances in her system that were not attributable to the medical care administered to her or her mother (705 ILCS 405/2—3(1)(c) (West 2002)), and because her parents created a substantial risk of physical injury to her by other than accidental means (705 ILCS 405/2—3(2)(ii) (West 2002)). The court further determined that Gwynne was a dependent minor as defined by section 2—4 of the Juvenile Court Act (705 ILCS 405/2—4 (West 2002)).

After making the foregoing findings, the court immediately convened a dispositional hearing pursuant to section 2—21(2) of the Juvenile Court Act (705 ILCS 405/2—21(2) (West 2002)). In a dispositional order entered December 7, 1999, the court found that Gwynne's mother, Detra, was an unfit parent and that both of Gwynne's parents were unable to care for her. The court determined that reasonable efforts had been made to prevent or eliminate Gwynne's removal from her home, that appropriate services aimed at family preservation and family reunification had been unsuccessful, and that it was in Gwynne's best interests that she be removed from the custody of the parents, guardian or custodian. The court therefore adjudged Gwynne to be a ward of the court and placed her under the guardianship of DCFS.

Through Lutheran Social Services of Illinois (LSSI), Gwynne was placed in a specialized foster home. In February of 2000, Gwynne was moved to what the record describes as a preadoptive, nonrelative foster home. A report prepared for the court by LSSI in May of 2000 indicated that the foster mother expressed a desire to adopt Gwynne if plans to return her home failed and

that Gwynne could reasonably expect to remain in the foster parent's care until adulthood.

Gwynne has now resided with the same foster family for five years, nearly her entire life. The family consists of the foster parents, their biological daughter, and an adopted daughter who has special needs similar to Gwynne's. Both foster parents have undergone extensive training to deal with the type of problems facing Gwynne, and the foster mother has a masters degree in early childhood education.

Except for the brief period immediately following her birth, Gwynne has never been under Detra's care. The original service plan formulated by DCFS had as its goal the reunification of Gwynne with her biological parents. By May of 2000, DCFS regarded the prognosis for attainment of that goal as poor. The father was facing prolonged incarceration, had not availed himself of any of the programs specified in his service plan, and had made no effort to send any cards or gifts to the child. Detra remained in disciplinary segregation, a status which precluded her participation in many of the programs specified in her service plan. With respect to the items she could address, including psychological evaluation and counseling, there was no evidence of any participation by her. Her efforts with respect to parenting were limited to sending monthly letters to Gwynne. Based on the foregoing, the parents' progress toward the goal of reunification with Gwynne was rated unsatisfactory. Following a permanency hearing on May 4, 2000 (see 705 ILCS 405/ 2—28 (West 2002)), a new goal was established for the child: substitute care pending termination of parental rights.

In November of 2000, the court convened a second permanency hearing to determine Gwynne's future status. Following that hearing, the court entered an order once again setting the appropriate permanency goal for

Gwynne as substitute care pending court termination of parental rights. Approximately two months later, the State petitioned the court pursuant to section 2—29 of the Juvenile Court Act (705 ILCS 405/2—29 (West 2002)) to terminate the parental rights of Gwynne's parents and to appoint a guardian with the power to consent to her adoption.

A termination petition brought pursuant to section 2—29 must contain an allegation that the parent is unfit and include the specific statutory grounds on which the charge of unfitness is based. *In re D.C.*, 209 Ill. 2d 287, 295 (2004). A court may not terminate a parent's rights on grounds not charged in the petition. At the same time, however, the State is not required to prove every ground it has alleged for finding a parent unfit. A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence. *In re D.C.*, 209 Ill. 2d at 296.

The permissible grounds for finding a parent unfit are set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2002)). As grounds for seeking termination of the parents' parental rights in this case, the State alleged that Gwynne's mother and father had failed "to maintain a reasonable degree of interest, concern or responsibility" as to her welfare (750 ILCS 50/1(D)(b) (West 2002)); that their criminal convictions rendered them depraved (750 ILCS 50/1(D)(i) (West 2002)); and that they failed to make reasonable efforts to correct the conditions that were the basis for Gwynne's removal from them "and/or failed to make reasonable progress toward return of the child to them" within nine months of when she was adjudged to be a neglected, abused and dependent minor "and/or within any 9 month period" after that adjudication. See 750 ILCS 50/1(D)(m) (West 2002). With respect to Detra alone, the State further alleged that she had been habitually drunk and

addicted to drugs other than those prescribed by a physician for at least one year prior to commencement of the proceedings. See 750 ILCS 50/1(D)(k) (West 2002).

The State subsequently filed a supplement to its petition asserting two additional grounds for unfitness. The first, directed at Gwynne's father, was that Gwynne was in the temporary custody or guardianship of DCFS, that the father was presently incarcerated, that prior to his incarceration he had little or no contact with her or provided little or no support for her, and that his incarceration will prevent him from discharging his parental responsibilities for a period in excess of two years after the petition seeking termination of his parental rights was filed. 750 ILCS 50/1(D)(r) (West 2002). The second additional ground was similar to the first, but applied to both parents. It alleged that Gwynne was in the temporary custody or guardianship of DCFS, that her parents were both currently incarcerated, that the parents had both been repeatedly incarcerated as a result of criminal convictions, and that their repeated incarceration has prevented them from discharging their parental responsibilities toward Gwynne. 750 ILCS 50/1(D)(s) (West 2002).

In March of 2002, while the termination proceedings were still pending, Detra was released from prison and placed on parole. A hearing on the State's termination petition was ultimately conducted on November 4, 2002, December 16, 2002, and February 10, 2003. During the course of that hearing, the circuit court heard testimony from Detra, the LSSI social workers assigned to Gwynne's case, and the social workers' supervisor. The court also admitted into evidence numerous exhibits, including records of the parents' criminal convictions, the service plans that had been prepared for them, and cards and letters that Detra had sent to Gwynne.

At the close of evidence, the court heard argument by

counsel. The court subsequently ruled that the State had established by clear and convincing evidence that Gwynne's parents were unfit persons within the meaning of sections 1(D)(b), (D)(i), (D)(m) and (D)(s) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(i), (D)(m), (D)(s) (West 2002)), as alleged in the State's petition. It therefore proceeded to a hearing on the question of whether it was in Gwynne's best interests that parental rights be terminated. The court answered this question in the affirmative. By order filed May 8, 2003, it terminated the parents' parental rights and appointed a guardian with the right to consent to Gwynne's adoption. See 705 ILCS 405/2—29 (West 2002).

Both parents appealed the circuit court's judgment.[2] They challenged the court's findings regarding both their fitness and Gwynne's best interests, arguing that those findings were contrary to the manifest weight of the evidence. They also asserted that the circuit court acted prematurely when it changed the permanency goal for Gwynne from returning home to termination of parental rights. In addition, the father contended that the opinions of one of the State's witnesses had not been sufficiently disclosed during discovery and that the circuit court therefore erred when it allowed the State to present

---

[2]The parents appealed separately, but their appeals were consolidated by the appellate court. While the appeal was pending, the parents filed various motions in the circuit and appellate court and in this court to stay, pending appeal, both termination of their parental rights and appointment of a guardian with the power to consent to adoption. Although a motion filed by the public guardian to expedite the appeal was allowed, all of the stay motions were ultimately denied. Adoption proceedings for Gwynne could therefore have gone forward. Whether they did or not cannot be ascertained from the record before us. Absent contrary information from the parties, we assume that Gwynne remains with her foster family, but has not yet been legally adopted.

that witness' testimony at the best-interests hearing. 346 Ill. App. 3d at 588-89.

The appellate court rejected all of the father's arguments and determined that there was no merit to the parents' claim that the circuit court had acted improperly when it changed the permanency goal for Gwynne to termination of parental rights. 346 Ill. App. 3d at 601, 603. With respect to Detra, the appellate court agreed with her claim that she should not have been found unfit under sections 1(D)(b), (D)(i) or (D)(m) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(i), (D)(m) (West 2002)). 346 Ill. App. 3d at 593, 596, 597. It concluded, however, that the record was sufficient to support the circuit court's determination that she was an unfit person within the meaning of section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 2002)) because of her repeated incarceration. 346 Ill. App. 3d at 598. The appellate court further concluded that there was adequate support in the record and the law to support the circuit court's finding that termination of parental rights was in Gwynne's best interests. 346 Ill. App. 3d at 601. The court therefore affirmed the circuit court's judgment. 346 Ill. App. 3d at 603.

One member of the appellate court panel dissented from that portion of the opinion which upheld termination of Detra's parental rights. The dissenting justice was in full agreement that the circuit court should not have found Detra unfit under sections 1(D)(b), (D)(i) or (D)(m) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(i), (D)(m) (West 2002)). Contrary to the majority, however, the dissenting justice would also have set aside, as contrary to the manifest weight of the evidence, the circuit court's conclusion that Detra was an unfit person within the meaning of section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 2002)) based on her repeated incarceration. In the dissenting justice's view,

efforts made by Detra after her release from prison to control her drug addiction, obtain employment as a drug counselor, and maintain an apartment; her diligence in attending monthly supervised visits with Gwynne; and her ability to look after her brother's children several times a week made her a role model for addicted mothers undergoing drug treatment. Whatever shortcoming Detra may have had prior to her release from prison, the dissenting justice wrote, "as the person she is now, [she] is not an unfit parent because of her convictions and incarcerations" 346 Ill. App. 3d at 609 (Garcia, J., dissenting).

Gwynne's father decided not to challenge the appellate court's judgment. Detra, however, petitioned this court for leave to appeal. 177 Ill. 2d R. 315. That petition was granted, and Detra elected to have the petition stand as her brief. 177 Ill. 2d R. 315(g). Briefs were then filed by the State and by the office of the Cook County public guardian, acting on behalf of Gwynne. In addition, a joint brief was filed by Chicago Legal Advocacy for Incarcerated Mothers, the Legal Assistance Foundation of Metropolitan Chicago, Loyola ChildLaw Center of Loyola University School of Law, and Companions Journeying Together, Inc., who were granted leave by our court to appear as *amici curiae*. Oral argument was subsequently conducted, and the matter is now before us for a decision on the merits. No issue is raised as to Gwynne's best interests. The sole question presented is whether Detra was properly found to be unfit.

A biological parent's right to raise his or her child is a fundamental liberty interest. Involuntary termination of parental rights is therefore a drastic measure. Where a parent has not consented to relinquishment of his or her parental rights, a court has no power to terminate the parent's rights involuntarily except as authorized by statute. *In re D.C.*, 209 Ill. 2d at 295.

A court's statutory authority to terminate a parent's rights involuntarily and to appoint a guardian with the right to consent to the child's adoption is delineated by the language of the Juvenile Court Act (705 ILCS 405/1—1 *et seq.* (West 2002)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2002)). *In re D.C.*, 209 Ill. 2d at 295. Under the Juvenile Court Act, parental rights cannot be terminated absent the parent's consent unless the court first determines, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2002)). 705 ILCS 405/2—29(2) (West 2002). Involuntary termination of a parent's rights without a prior showing of unfitness would, in fact, be unconstitutional. *In re Petition of Kirchner*, 164 Ill. 2d 468, 501 (1995).

The burden of proving by clear and convincing evidence that a parent is unfit rests with the State. *In re M.H.*, 196 Ill. 2d 356, 365 (2001). A trial court's determination that a parent's unfitness has been established by clear and convincing evidence will not be disturbed on review unless it is contrary to the manifest weight of the evidence. A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *In re J.J.*, 201 Ill. 2d 236, 249 (2002). In assessing whether the court's decision is contrary to the manifest weight of the evidence, a reviewing court must remain mindful that every matter concerning parental fitness is *sui generis.* See *In re Cornica J.*, 351 Ill. App. 3d 557, 566 (2004). Each case must therefore be decided on the particular facts and circumstances presented. *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

As discussed earlier in this opinion, the appellate court in this case rejected as contrary to the manifest weight of the evidence all of the grounds on which Detra was alleged by the State to be unfit save one: repeated

incarceration. That basis for lack of fitness is defined in section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 2002)), which provides that a parent may be found unfit if

> "[t]he child is in the temporary custody of [DCFS], the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child."

There is no dispute that the first three conditions set forth in this statute were satisfied. Gwynne was in the temporary custody of DCFS; Detra, her mother, was incarcerated at the time the petition for termination of her parental rights was filed; and Detra had been repeatedly incarcerated as a result of criminal convictions. The disagreement in this appeal concerns the existence of the fourth element, whether Detra's "repeated incarceration has prevented [her] from discharging *** her parental responsibilities for [Gwynne]."

In assailing the appellate court's decision, Detra argues that the court's analysis effectively read this element out of the law. According to her, the appellate court adopted what amounts to a *per se* rule under which the mere fact of repeated incarceration is sufficient, in itself, to establish lack of fitness.

Had the appellate court actually taken the approach suggested by Detra, her concerns would be justified. Under the plain and unambiguous language of section 1(D)(s), repeated incarceration alone will not support a finding that a parent is unfit. The statute specifically requires an additional showing that the repeated incarceration has prevented the parent from discharging his or her parental responsibilities. 750 ILCS 50/1(D)(s) (West 2002).

Our court has construed this provision as evincing an intention by the legislature that courts

"consider the overall impact that repeated incarceration may have on the parent's ability to discharge his or her parental responsibilities ***, such as the diminished capacity to provide financial, physical, and emotional support for the child." *In re D.D.*, 196 Ill. 2d at 421. Because this standard looks to the effects of repeated incarceration, there is no requirement that all of the incarcerations have occurred during the child's lifetime. Incarceration that predates the child's birth can also be considered under section 1(D)(s) if it has impeded a parent's ability to acquire appropriate life skills or provide the types of physical, mental, moral, material and emotional support children require. *In re D.D.*, 196 Ill. 2d at 421-22.

Contrary to Detra's claim, the appellate court did not misconstrue the law in this regard. It was mindful of the foregoing principles (346 Ill. App. 3d at 597-98) and applied them. In upholding the finding of unfitness based on repeated incarceration, the court noted the parents' terms in prison, but went beyond that, specifically citing testimony by one of the social workers assigned to Gwynne's case that neither of her parents had been able to provide a stable home, financial or emotional support for the first three years of Gwynne's young life. 346 Ill. App. 3d at 598.

*Amici* argue that in assessing the effects of incarceration on the parents' ability to parent, the appellate court improperly focused on the period when Detra and Gwynne's father were still in prison. In *amici*'s view, a court cannot make a meaningful assessment of the overall impact repeated incarceration has had on a person's ability to parent unless it considers the person's conduct throughout the period leading up to the hearing on the State's petition to terminate. With respect to Detra, *amici* assert that the court should therefore have looked to the efforts she made toward rehabilitation following her release on parole, not simply her conduct while in prison.

The State, for its part, argues that the salient cutoff point for assessing a person's fitness under section 1(D)(s) should be the date the petition to terminate is filed. Because a parent must be incarcerated at the time the petition is filed for section 1(D)(s) to apply, this construction would necessarily preclude any consideration of anything done by the parent following his or her release from custody. In the State's view, a parent's post-custody actions should only be considered at the second phase of the termination proceeding dealing with the child's best interests.[3] The office of the public guardian, appearing on Gwynne's behalf, shares this view. Accordingly, the State and the public guardian argue that the time frame employed by the appellate court in reviewing whether Detra was properly declared unfit under section 1(D)(s) of the Adoption Act was correct.

Contrary to the position taken by the State and the public guardian, we do not believe that the date on which the termination petition is filed marks the ending point for assessing the impact repeated incarceration has had on a person's ability to parent. Consider the language the General Assembly has employed. When addressing the effects of incarceration on a person's ability to parent, section 1(D)(s) does not speak in the past tense. Rather, it asks whether the repeated incarceration "has prevented" the parent from discharging his or her parental responsibilities. "Has prevented" is in the

---

[3]We note, parenthetically, that this argument is inconsistent with the position taken by the State in the circuit court. When presenting its case on the question of Detra's fitness, the State did not limit its evidence to developments which took place prior to the date the termination petition was filed. It also adduced evidence of Detra's conduct following her release from prison. Similar evidence was presented by Detra herself, with no objection by the State. At no point during the trial court proceedings did the State claim that such evidence could not be considered in assessing Detra's fitness based on the factor of repeated incarceration.

present perfect tense, a verb form used to denote action beginning in the past and continuing to the present. See *Williams v. Augusta County School Board*, 248 Va. 124, 128, 445 S.E.2d 118, 120-21 (1994); Warriner's English Grammar and Composition 148 (1965). In the context of fitness proceedings, "the present" would be the time when the matter is being considered by the trial court. We therefore believe that section 1(D)(s) must be read as directing courts to consider how incarceration has affected a person's ability to parent throughout the period beginning when the person went to jail and continuing until the time the termination hearing is conducted.

To hold otherwise would be inconsistent with the purposes of the law. As we have previously held, the overall impact of repeated incarceration is the touchstone of section 1(D)(s). *In re D.D.*, 196 Ill. 2d at 420-21. Where, as here, a parent is released from custody after the termination petition is filed, the parent will have the opportunity to deal with his or her parental responsibilities in a manner that is qualitatively different than was possible while the parent remained in jail. The result may or may not be positive. The obvious impediments presented by physical incarceration will be removed, but so will the institutional systems that may have aided the parent in meeting his or her personal needs and obligations.

Instead of being housed, clothed and fed by someone else, the parents will be responsible for housing, clothing and feeding not only themselves, but their offspring. No longer under constant supervision, their ability to control their own behavior will depend on their personal qualities rather than external constraints. If they were addicted to drugs, their access to drugs will be restored. If they tire of the demands imposed by their child, they will not be able to simply hand the child back to a social worker at the end of a supervised visit and return to their cells. New living skills will be needed for them to

live independently. Health care and schooling issues will have to be addressed. Transportation and employment challenges will have to be met. The contrast with prison life could not be more stark.

Given these differences, the postincarceration period may provide useful insight into the effects repeated incarceration has had on the parent's actual ability to function as a parent in the outside world. If the court's inquiry were limited to the period preceding the date on which the termination petition was filed, the ability to gain this insight would inevitably be lost. Advances made by the parent upon release from prison would go unobserved. Correspondingly, setbacks suffered by the parent could not be considered. The resulting assessment of how the repeated incarceration affected the person's ability to parent would necessarily be incomplete and inaccurate. Without a full and accurate assessment of the effects imprisonment has had on the ability to discharge parental responsibilities, the purpose of section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 2002)) would, in turn, be hindered.

Although *amici* are therefore correct that a court should look beyond the filing of the termination petition and consider the parent's experiences up to the time of the hearing on the petition, no valid claim can be made that the appropriate period was not examined here. The parties' suggestion that the court did not look beyond the period of incarceration, when the termination petition was filed, is simply wrong. The termination petition was filed in January of 2001, when Gwynne was a year and a half old. Had that filing date been used as the cutoff, the court's focus would have been limited to the period before Gwynne turned two. As noted earlier in this opinion, however, the State and Detra each presented evidence at the termination hearing concerning Detra's circumstances and experiences during the period begin-

ning with her first convictions, continuing through her time in prison, and ending with her situation at the time the hearing took place.

That hearing commenced in November of 2002, when Gwynne, who was born in June of 1999, was three. The hearing concluded in February of 2003, when Gwynne was still three. In upholding the determination that Detra was unfit based on the factor of repeated incarceration, the appellate court reviewed the record developed in the circuit court and concluded that neither she nor Gwynne's father "was able to provide a stable home, financial or emotional support for the first three years of Gywnne P.'s young life." 346 Ill. App. 3d at 598. Because the first three years of Gwynne's life encompassed the period in which the hearing on the termination petition was conducted, and because the evidence presented by the parties spanned the period leading to when the termination hearing began, it is evident that the appellate court did, in fact, consider Detra's conduct after the State filed its petition to terminate her parental rights.

Even if there were some valid question about the time frame considered by the appellate court, there is certainly no question that the circuit court applied section 1(D)(s) of the Adoption Act correctly. The record shows that it evaluated the overall impact of Detra's ability to discharge her parental responsibilities based on evidence which encompassed her experience after being released from prison. It did not limit its inquiry to the period preceding filing of the termination petition.

In finding Detra unfit, the circuit court surveyed the full range of her life experiences leading up to the hearing on the State's termination petition, eight months after her release from the Department of Corrections. The record showed that Detra has been a long-term substance abuser whose drug addiction drove her to crime and then to prison. While in prison, and now on

parole and working as a "detox specialist" for a halfway house, Detra has managed to remain drug free. She has not been arrested for any additional crimes. She has taken and successfully completed various classes concerning substance abuse, parenting, anger management and grief. She participated in "self-discovery" seminars to help her understand why she continued to "get high." She now attends Alcoholics Anonymous meetings regularly and, after the termination hearing commenced, was able to move into her own apartment.

Detra's success in battling the addiction she has suffered since the early 1990s is germane to a number of the grounds of unfitness charged by the State in its termination petition. It is not pivotal, however, to the court's inquiry under section 1(D)(s) of the Adoption Act, the matter before us here. As laudable as Detra's efforts have been, and we do not deny that they are deserving of recognition, the critical issue at hand is the effect of Detra's repeated incarceration on her ability to discharge her parental responsibilities.

By any meaningful standard, those effects have been devastating. Detra has never actually parented Gwynne, and the evidence adduced by the State supports the trial judge's finding that she would not have the capability to serve as Gwynne's parent if given the opportunity to do so now. Detra was behind bars before Gwynne's birth and for the first two years and nine months following her birth. At a time when most new mothers are learning to care for their babies and sharing their experiences with other new mothers, Detra was not only separated from Gwynne, but segregated from the general prison population.

Raising any child is difficult. Raising a child with Gwynne's developmental deficits is particularly challenging. Because of her repeated incarceration, Detra did not acquire the skills and knowledge necessary to undertake

that special challenge. Indeed, Detra's correspondence does not even acknowledge that Gwynne's developmental deficits might be problematic.

An additional consideration, and one that is relevant under our analysis in *In re D.D.*, 196 Ill. 2d at 421, concerns Detra's diminished capacity to provide financial support for Gwynne as a result of her incarceration. Throughout the years she was in and out of jail, Detra was unemployed. She has no high school diploma. While many prison inmates succeed in obtaining a high school equivalency degree, Detra did not, nor did she learn a trade or obtain any other marketable skills. When released on parole, she left the Department of Corrections with a prison record and little else.

Detra was unable to provide financial support for Gwynne while she was in prison. There is no indication in the record that she could provide financial support for Gwynne now. Were it not for the fact that a halfway house put her on its payroll as a detox specialist, it is difficult to see how she could even support herself financially. That is particularly troubling given that with her special needs, Gwynne may require special services involving additional costs beyond those involved in raising a child who does not suffer from her developmental problems.

If Detra remains committed to her rehabilitation, this may change. Other drug addicts have escaped their substance abuse problems, overcome their criminal histories, and gone on to lead productive lives. The challenge faced by trial judges in cases such as this is that they cannot enter orders determining the course of a young child's life based on hope for the parent's future. They must make their decisions based on the facts before them. Under the facts adduced in this case, there was ample basis to conclude that Detra's repeated incarceration has prevented her from meeting her financial

responsibilities toward Gwynne, just as it has prevented her from meeting the other obligations she owes as Gwynne's mother.

At the outset of its opinion, the appellate court aptly observed that Detra "made substantial progress toward correcting her life as she sought to regain custody of her child, \*\*\* but she could not overcome the prison terms that prevented her from discharging her parental responsibilities." 346 Ill. App. 3d at 588. We can think of no better way to characterize the situation presented by this case. Having carefully considered the record before us, we agree with the appellate court that the circuit court's determination that Detra is unfit under section 1(D)(s) of the Adoption Act was not against the manifest weight of the evidence.

In its brief, the State asserts that the judgment terminating Detra's parental rights should be affirmed on the alternative grounds that Detra was unfit under sections 1(D)(m)(ii) and (D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii), (D)(m)(iii) (West 2002)). Because we have concluded that the appellate court acted properly in sustaining the finding of unfitness based on repeated incarceration and because a single alleged ground for unfitness is sufficient to terminate a parent's rights where it has been established by clear and convincing evidence (*In re D.C.*, 209 Ill. 2d at 296), there is no need to address this additional argument.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*