2025 IL App (4th) 250026

NOS. 4-25-0026, 4-25-0027 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 6, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.H. and C.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Logan County |
| Petitioner-Appellee, | ) | |
| v. | ) | Nos. 23JA1 |
| Anissa H., | ) | 24JA1 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Jonathan C. Wright, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court, with opinion.
Justices DeArmond and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1 In this consolidated appeal, respondent Anissa H. challenges the trial court's judgment terminating her parental rights over her children, A.H. and C.H. She argues that the court erred in finding her unfit on any of the grounds alleged as to A.H. She further argues that, because reversal is required as to A.H., the best interest finding as to C.H. must also be reversed. We agree that the court below erred by granting the State's petition to terminate respondent's parental rights over A.H. on the grounds alleged, so we reverse that judgment. In C.H.'s case, we conclude that the court's finding of unfitness is supported by clear and convincing evidence and that termination of respondent's parental rights was in C.H.'s best interest.

¶ 2 I. BACKGROUND

¶ 3 In March 2021, respondent was charged with methamphetamine delivery (720

ILCS 646/55 (West 2020)) in Logan County case No. 21-CF-66 and released on bond. She gave birth to C.H. in December 2022. At the time, respondent tested positive for methamphetamine and cannabis, and the umbilical cord and meconium tested positive for cannabis. A safety plan was initially put in place for C.H. but was terminated after testing revealed that C.H. did not test positive for methamphetamine.

¶ 4       In February 2023, the trial court held a hearing on the State's petition for an adjudication of wardship on the basis that C.H. was not receiving the care necessary for her well-being and was in an environment injurious to her welfare. See 705 ILCS 405/2-3(1)(a)-(b) (West 2022). The State *did not* seek an adjudication of neglect on the basis that C.H. was a "newborn infant whose blood, urine, or meconium contains any amount of a controlled substance." *Id.* § 2-3(1)(c). As such, the court was never asked to find, and never did find, that C.H. was neglected on this basis. The court found the allegations in the petition proven and placed custody and guardianship with the Illinois Department of Children and Family Services (DCFS).

¶ 5       At the dispositional hearing for C.H., in August 2023, the trial court found respondent unfit based on her substance abuse issues and made C.H. a ward of the court. In October 2023, respondent entered a partially negotiated guilty plea on the methamphetamine trafficking charge but remained out on bond.

¶ 6       Respondent gave birth to A.H. in January 2024, and both mother and child tested positive for methamphetamine immediately thereafter. The same month, the State sought an adjudication of wardship as to A.H., alleging that she was neglected due to respondent's drug use and that A.H. was born with blood, urine, or meconium containing any amount of a controlled substance or the metabolite of a controlled substance.

¶ 7       In February 2024, respondent's bond was revoked on the methamphetamine

trafficking charge. In April, she pleaded guilty to the charged offense and was sentenced to imprisonment for a term of eight years. The record does not reflect that respondent has ever received a sentence of incarceration for any other offense or at any other time.

¶ 8        At a June 2024 hearing, the trial court found the allegations in the adjudication petition proven and placed custody and guardianship of both children with DCFS. A dispositional order followed, finding respondent unfit and unable to care for A.H. due to incarceration and substance abuse issues.

¶ 9        Petitions to terminate respondent's parental rights as to both children were filed in August 2024. Both petitions relied on section 1(D)(t) of the Adoption Act (750 ILCS 50/1(D)(t) (West 2024), *repealed by* Pub. Act 103-941, § 120 (eff. Jan. 1, 2025)), which then provided for a finding of unfitness when

> "at birth the child's blood, urine, or meconium contained any amount of a controlled substance as defined in subsection (f) of Section 102 of the Illinois Controlled Substances Act *** and *** the biological mother of this child is the biological mother of at least one other child who was adjudicated a neglected minor *under subsection (c) of Section 2-3 of the Juvenile Court Act of 1987*, after which the biological mother had the opportunity to enroll in and participate in a clinically appropriate substance abuse counseling, treatment, and rehabilitation program." (Emphasis added.)

See 750 ILCS 50/1(D) (West 2024).

However, the State would later concede during the fitness hearing that section 1(D)(t) was inapplicable to C.H.

¶ 10        Both petitions also relied on section 1(D)(s), which provides for a finding of

unfitness when

> "[t]he child is in the temporary custody or guardianship of the Department of Children and Family Services, the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging *** her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 2024).

¶ 11 Finally, the petition in C.H.'s case relied on section 1(D)(m)(i) and (ii), alleging that, during the nine-month period from July 14, 2023, to April 14, 2024, respondent failed to make reasonable efforts to correct the conditions that were the basis for C.H.'s removal from her care (*id.* § 1(D)(m)(i)) and failed to make reasonable progress toward the return of C.H. to her care (*id.* § 1(D)(m)(ii)). The State did not raise this ground for unfitness with respect to A.H., who was born within that nine-month period. See *In re D.C.*, 209 Ill. 2d 287, 300-01 (2004) (rejecting the proposition that the nine-month period prescribed by section 1(D)(m) could start before the child was born).

¶ 12 The trial court conducted a hearing in both cases simultaneously.

¶ 13 A. Fitness Hearing

¶ 14 At the beginning of the fitness hearing, the trial court took judicial notice of, among other things, the family service plans created by the agencies involved and the conviction and sentence in Logan County case No. 21-CF-66.

¶ 15 Respondent testified that she was sentenced to eight years in the Illinois Department of Corrections, to be served at 50%, with a projected parole date of December 14, 2027. She confirmed that she was the mother to both children at issue in this case. She consumed cannabis

and methamphetamine while she was pregnant with C.H. and confirmed that C.H. tested positive for cannabis after she was born. Respondent stated that she consumed methamphetamine "frequently," as well as cannabis, when pregnant with A.H., and she confirmed that A.H. tested positive for methamphetamine after she was born. Respondent acknowledged that she was provided with substance abuse, mental health, and parenting support services through DCFS but did not engage with the services. She completed a mental health assessment, which concluded that no further mental health services were required.

¶ 16        Various caseworkers and investigators testified to their involvement, noting that both respondent and the children tested positive for controlled substances when respondent gave birth to the children at the hospital. Providers for parenting and substance abuse classes testified that there was no engagement in the services, despite referrals and outreach to respondent.

¶ 17        Apple Glover, a child protection specialist with DCFS, also testified to her involvement in the investigation immediately after the birth of C.H. While a safety plan was put into place following the positive tests for controlled substances, Glover noted that C.H. was not removed from respondent's custody until C.H. was found at a residence and with individuals who respondent had been told were inappropriate.

¶ 18        Nikki Edwards, a child protection specialist with DCFS, testified that respondent had been significantly noncompliant with the substance abuse treatment component of the service plan. Respondent had been scheduled for an initial substance abuse assessment five times since March 2023, but she failed to attend any of the appointments. Edwards confirmed that respondent had not completed any substance abuse or anger management treatment and failed to engage in parenting classes.

¶ 19        The trial court found that the State had sufficiently proven that respondent had been

repeatedly incarcerated, preventing her from discharging her parental duties, thereby rendering her unfit. The court also found the State had proven that A.H. was born with a controlled substance in her system and that respondent had the prior opportunity to enroll in an appropriate substance abuse treatment program but failed to do so. Moreover, respondent had failed to make reasonable efforts or reasonable progress toward the return of C.H., as evidenced by the testimony of the caseworkers. The matter was then set for a best interest hearing.

¶ 20                                    B. Best Interest Hearing

¶ 21          At the best interest hearing, the trial court reviewed, without objection, the best interest reports for A.H. and C.H., along with the evidence from the fitness hearing. The reports reflected that C.H. and A.H. had been placed with the same foster family. C.H. was placed with the foster family on March 8, 2023, having previously been cared for by them when they babysat for her former foster parent. She had developed strong bonds with the foster parents, her foster siblings, and A.H. The report also explained that respondent had failed to maintain contact with the caseworker and similarly failed to attend visitation with C.H. A.H. was similarly bonded with her foster parents, biological sister, and foster siblings. A.H. had been in the same foster placement since being placed in the care of DCFS on January 19, 2024. The foster parents provided for the children's needs and provided a safe, stable, and loving home, which was conducive to their growth and the enjoyment of their childhood. Both reports recommended the termination of respondent's parental rights in order for the children to achieve permanence with the foster family.

¶ 22          Respondent attended regular visits with A.H., but her visits became less frequent during the summer of 2023. Respondent failed to maintain regular contact with the caseworker, did not inform the caseworker of address changes, and neglected to update her current phone numbers, thereby diminishing her contact with A.H. prior to her incarceration.

¶ 23    Respondent testified that she had made mistakes in the past, including a long-standing addiction to methamphetamine but argued against the termination of her parental rights, citing her ongoing efforts toward rehabilitation. She detailed her involvement in educational and substance abuse programs, including the "Parent Do Good" group, Alcoholics Anonymous, and Narcotics Anonymous. She discussed her varied work history, asserting she had the potential to financially support her family upon release and expressing a strong desire to maintain a relationship with her children.

¶ 24    The trial court commented that it was considering all the testimony, evidence, and arguments presented, while focusing on all relevant statutory factors. The court went on to "highlight" a few of the factors, including the children's sense of attachment to their current home, which included love, security, familiarity, and continuity of affection. C.H. had spent approximately 20 months of her approximately 2-year life in the current foster home, while A.H. had been with the foster family since birth. This was the only home the children had ever known. There were strong bonds between the children and their foster parents and siblings, and leaving the children with the foster parents would be the least disruptive placement.

¶ 25    The trial court also commented that respondent would be incarcerated for "almost another three years, and that would be counterproductive for the children's best interest to wait for another three years to have their bonding get even deeper with the foster parents, and then to rip them out of the only home they've really ever known and the only family they've ever known."

¶ 26    For those reasons, "along with the ten other statutory factors," the trial court ruled in favor of terminating respondent's parental rights for both children.

¶ 27    This appeal followed. Appellate counsel for respondent initially moved to

- 7 -

withdraw, asserting that there was no issue of arguable merit to present. This court denied the motion and directed briefing on three specific issues and any other issue that counsel deemed worthy of discussion. We now turn to those issues.

¶ 28                                    II. ANALYSIS

¶ 29          In the merits briefing, respondent argues that the trial court erred by (1) finding respondent unfit on the basis that she was repeatedly incarcerated under section 1(D)(s) and (2) finding respondent was unfit under section 1(D)(t), where the statutory prerequisites were never met. Further, respondent argues that if this court agrees that the unfitness finding as to A.H. was in error, the best interest finding regarding C.H. was tainted by that error and must be reversed.

¶ 30                            A. Timing of the Decision

¶ 31          First, we address the timing of this disposition. Pursuant to Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), this disposition was due 150 days after the notice of appeal was filed, absent good cause shown. The initial delay in this case was attributable to our denial of an *Anders* motion (see *Anders v. California*, 386 U.S. 738 (1967)) filed by appellate counsel for respondent. The revised briefing schedule entered upon the denial of the motion delayed our disposition beyond the deadline noted above. Briefs of both respondent and the State were each about one month late, the latter apparently due to the failure of respondent's counsel to serve a copy of her brief on the State.

¶ 32          Our denial of counsel's *Anders* motion provides good cause for delaying this disposition (see *In re H.B.*, 2022 IL App (2d) 210404, ¶¶ 38-39), but that does not mean we view the subsequent delays in this case as acceptable. While we understand that there were issues with service of respondent's brief, we also emphasize that the deadlines in our briefing orders are self-executing, as is the rule that extensions of time must be sought before the relevant due date. See

- 8 -

Ill. S. Ct. R. 361(f) (eff. Apr. 15, 2024); accord Ill. App. Ct., Fourth Dist., R. 104(c) (Oct. 1, 2022) ("A motion for extension of time should be filed, where practicable, at least 5 days prior to the date to be extended if served electronically.").

¶ 33                           B. The Trial Court's Findings

¶ 34        Under section 2-29(2) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29(2) (West 2024)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence that the parent is "unfit" as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). Second, if the court makes a finding of unfitness, the State must prove by a preponderance of the evidence it is in the minor child's best interest that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). At the second step, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *Id.* at 364.

¶ 35        We will reverse a judgment terminating parental rights only if the trial court's finding at one or both steps is against the manifest weight of the evidence. *In re J.L.*, 236 Ill. 2d 329, 344 (2010) "A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 36        Before proceeding to the analysis of the underlying merits as it relates to the children individually, we note the State argues that respondent has forfeited all her arguments on appeal due to a failure to comply with Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). However, we do not find that the briefing was so deficient that it hindered our review. We find

that respondent's brief, though somewhat abbreviated, sufficiently developed the contentions on appeal.

¶ 37                                                    1. *A.H.*

¶ 38         On appeal, the State concedes that section 1(D)(t) is inapplicable to A.H. because respondent's other child, C.H., had not been adjudicated a neglected minor under the provision of the Juvenile Court Act emphasized above. We accept the State's concession on this point. Because the State conceded below that this section also did not apply to C.H., we need not address section 1(D)(t) further.

¶ 39         After setting aside the trial court's finding under section 1(D)(t), the remaining alleged ground for unfitness in A.H.'s case involves section 1(D)(s). It is undisputed that respondent has been incarcerated just once as a result of just one criminal conviction for methamphetamine delivery and that this conviction and incarceration took place during A.H.'s lifetime. The question in this case is whether these undisputed facts are sufficient to support a finding of unfitness under section 1(D)(s).

¶ 40         The Adoption Act sets forth an extensive list of bases on which a court can find a parent unfit, some of which relate to the parent's criminal convictions or incarceration. A parent might be presumed to be depraved, and therefore unfit, if found guilty of specified legal offenses. 750 ILCS 50/1(D)(i) (West 2024). Also, without regard to the nature of the underlying offense, section 1(D)(r) provides that a parent can be found unfit if, among other things, "incarceration will prevent the parent from discharging his or her parental responsibilities for the child for a period in excess of 2 years after the filing of the petition or motion for termination of parental rights." *Id.* § 1(D)(r). We note that this court has previously identified that there are four independent elements of section 1(D)(r). *In re M.H.*, 2015 IL App (4th) 150397, ¶ 25. In other words, while interference

with parental responsibilities is one of the elements necessary to invoke the provision, its presence does not override the other three requirements. While section 1(D)(r) seems to apply here on its face, it was not the basis asserted by the State for termination. See *In re D.W.*, 214 Ill. 2d 289, 308 (2005) (holding that "it is improper to terminate a parent's rights on grounds not alleged in a petition to terminate").

¶ 41　　　　Another part of this scheme is the provision at issue here, section 1(D)(s), which addresses situations where incarceration may not last two years, but *repeated* incarceration still has "prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 2024). This makes section 1(D)(s) different from the immediately preceding section 1(D)(r), as the latter allows for a finding of unfitness for "a single incarceration." *M.H.*, 2015 IL App (4th) 150397, ¶ 24. As noted above, the evidence here shows that respondent was incarcerated on one occasion. While it is possible that she may have been subject to pretrial detention on other occasions, pretrial detention does not constitute "incarceration" as used in the Adoption Act. See *id.* ¶ 28 (holding that "incarceration" under section 1(D)(r) means imprisonment as a result of a criminal conviction).

¶ 42　　　　Determining the correct interpretation of section 1(D)(s) presents a question of statutory construction that is subject to *de novo* review. *People v. Howard*, 2017 IL 120443, ¶ 19. "The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning." *Id.* When the supreme court has already decided a question of statutory construction, we are bound to follow that decision when construing the statute. *Doyle v. Hood*, 2018 IL App (2d) 171041, ¶ 35.

¶ 43　　　　The supreme court first addressed this statutory provision in the case of *In re D.D.*,

196 Ill. 2d 405 (2001). The minor's father in *D.D.* had been "incarcerated only once during D.D.'s lifetime," but he had been incarcerated on another occasion before D.D. was born. *Id.* at 418. The father was found unfit under section 1(D)(s), but he argued on appeal "that a parent may be found unfit only when it can be shown that the parent was unable to fulfill his *** parental duties as a result of being repeatedly unavailable, during the lifetime of the child, due to incarceration." *Id.* The court rejected this proposition as follows:

"Section 1(D)(s), no doubt, is applicable in situations where the parent, during the lifetime of the child, has had recurring absences caused by incarcerations which have prevented the parent from providing his or her child with a stable home environment. [Citations.] However, the plain language of the provision allows for a broader application. We note, as the trial court did, that the final phrase of section 1(D)(s) uses the term 'repeated incarceration,' not 'repeated incarcerations.' Though this may seem a minor distinction, we find the legislature's use of the singular form to be both deliberate and significant.

The plural form has a more narrow connotation. Had the legislature used the plural form, stating 'the parent's *repeated incarcerations* have prevented the parent from discharging his or her parental responsibilities for the child,' the specific reference would be to the incarcerations themselves. A parent's unfitness would stem from these incarcerations—these absences—which prevent the parent from discharging his or her parental duties.

The singular term, however, has a broader connotation. By using the singular form, stating 'the parent's *repeated incarceration* has prevented the parent from discharging his or her parental responsibilities for the child,' the legislature

- 12 -

makes reference to the general inclusive concept of 'repeated incarceration,' suggesting that courts may consider the overall impact that repeated incarceration may have on the parent's ability to discharge his or her parental responsibilities—circumstances which may flow from the fact of repeated incarceration, such as the diminished capacity to provide financial, physical, and emotional support for the child." (Emphases in original.) *Id.* at 420-21.

The supreme court concluded that the respondent father "ha[d] been prevented, not only by his present incarceration, but as a result of his repeated incarceration, from discharging his parental responsibilities." *Id.* at 421-22. In other words, while apparently continuing to give life to the statutory requirement of "repeated" incarceration, the supreme court held that incarceration occurring prior to the child's birth might subsequently impact the ability to parent that child. It is essential to recognize that *D.D.* did *not* hold that a single incarceration was sufficient under section 1(D)(s) so long as the parent was unable to meet his parenting responsibilities; it decided that an incarceration occurring before the child's birth could satisfy the requirement of "repeated" incarceration under section 1(D)(s). In other words, it *reaffirmed* the requirement that there must be more than one incarceration. If only one incarceration were necessary, *D.D.*'s entire analysis about the prebirth incarceration would have been unnecessary.

¶ 44        In a subsequent decision, the First District upheld a finding of unfitness under section 1(D)(s), despite the respondent father's argument that "the State had not proven he had been incarcerated as a result of more than one conviction." *In re E.C.*, 337 Ill. App. 3d 391, 399 (2003). *E.C.* cited *D.D.* for the proposition that "only one incarceration is necessary for a finding of unfitness under subsection 1(D)(s) if the court finds the parent was prevented from discharging his responsibilities." *Id.* (citing *D.D.*, 196 Ill. 2d at 420-22). Strictly speaking, this aspect of *E.C.*

was *dicta* because the father in that case had been incarcerated on two occasions as a result of three convictions. See *id.* ("Respondent's argument is factually inaccurate."); see also *Blount v. Stroud*, 232 Ill. 2d 302, 324 (2009) ("[T]he precedential scope of our decision is limited to the facts that were before us.").

¶ 45        Furthermore, we believe it was a misstatement of *D.D.*'s holding, which emphasized the legislature's focus on "circumstances which may flow from the fact of repeated incarceration." *D.D.*, 196 Ill. 2d at 421. To say that *one* incarceration is all that is necessary to prove unfitness on the basis of *repeated* incarceration makes no sense, as it would essentially write the word "repeated" out of section 1(D)(s), something *D.D.* did not purport to do. See *id.* at 420 ("[W]e apply the provision as written."). This is evident not only from *D.D.*'s consistent use of the word "repeated" but from the supreme court's subsequent decision in *Gwynne P.*, where the court stated that because section 1(D)(s) "looks to the effects of repeated incarceration, there is no requirement that *all of the incarcerations* have occurred during the child's lifetime." (Emphasis added.) *Gwynne P.*, 215 Ill. 2d at 356. In other words, the respondent must have been incarcerated at least twice, but only one of those incarcerations need have occurred during the child's lifetime.

¶ 46        Even assuming that the supreme court's decisions leave any room for doubt as to whether a single incarceration can somehow constitute repeated incarceration under section 1(D)(s), that doubt is dispelled by the statutory requirement for the trial court to find that respondent "ha[d] been repeatedly incarcerated as a result of criminal *convictions*." (Emphasis added.) 750 ILCS 50/1(D)(s) (West 2024). To find that a single *conviction* can satisfy section 1(D)(s) is inconsistent with the plain language of the statute, as well as the reasoning of *D.D.*, *i.e.*, that the legislature's choice between singular and plural terms in section 1(D)(s) is "both deliberate and significant." *D.D.*, 196 Ill. 2d at 420.

¶ 47 It remains true under section 1(D)(s) that repeated incarceration must have "prevented the parent from discharging his or her parental responsibilities for the child" in order to stand as a basis for finding unfitness. 750 ILCS 50/1(D)(s) (West 2024). However, this is independent of the requirement that the incarceration must have been *repeated*. See *M.H.*, 2015 IL App (4th) 150397, ¶¶ 25-29 (noting that there were four requirements under section 1(D)(r), including interference with the ability to parent, and proceeding to consider each independently). While the Adoption Act clearly intends to scrutinize these issues in the context of the effect on the child, this broad goal does not override the specific requirements of the statute. "We are not at liberty to enlarge the scope of a plain provision in order to more effectively accomplish the general purpose of the statute." *In re Estate of Ivy*, 2019 IL App (1st) 181691, ¶ 32. Even if a single incarceration interfered with the ability to parent, it would not satisfy section 1(D)(s)'s requirement that the incarceration be *repeated*.

¶ 48 Accordingly, we decline to follow the First District's suggestion in *E.C.* that a finding of unfitness under section 1(D)(s) may be upheld even when "the State ha[s] not proven [the respondent] ha[s] been incarcerated as a result of more than one conviction." *E.C.*, 337 Ill. App. 3d at 399; see *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008) (explaining that one district may part company from another). The undisputed facts show that the State did not satisfy its burden of proving that respondent has been incarcerated as a result of more than one conviction, so we conclude that the trial court's finding of unfitness under section 1(D)(s) is erroneous.

¶ 49 Because neither of the alleged grounds of unfitness with respect to A.H. are supported by clear and convincing evidence, the trial court's judgment terminating respondent's parental rights over A.H. must be reversed, as must its finding that adoption would have been in

her best interest at that time. See *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990) ("[W]hether the child's eventual adoption *** would improve [her] future financial, social, and emotional atmosphere is not relevant in judging the fitness of the natural parent.").

¶ 50        Although remand is unnecessary in A.H.'s case because our reversal of the trial court's judgment is sufficient to return the case to where it stood before her parental rights were terminated (see *Garley v. Columbia LaGrange Hospital*, 377 Ill. App. 3d 678, 682 (2007)), we note that the trial court retains the authority to entertain a renewed petition to terminate respondent's parental rights in the ongoing proceeding below. See 705 ILCS 405/2-13(1), (4) (West 2024); *cf. Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 357 (2002) ("Plaintiff should not be denied the opportunity to amend his complaint because the invalidity of his case *** was determined first in the reviewing court[ ] rather than at the trial level.").

¶ 51                                    2. *C.H.*

¶ 52        Turning to C.H., the State argues that we should affirm the trial court's judgment finding respondent unfit as to C.H. based on the two additional grounds of unfitness the State alleged in C.H.'s case—namely, that from July 14, 2023, to April 14, 2024, respondent failed to (1) make reasonable efforts to correct the conditions that were the basis for C.H.'s removal from her care and (2) make reasonable progress toward C.H.'s return to her care. See 750 ILCS 50/1(D)(m)(i)-(ii) (West 2024); see also *D.C.*, 209 Ill. 2d at 300 (explaining that the trial court must make a finding of unfitness as to each child individually). Respondent does not contest the unfitness finding regarding C.H. on appeal; indeed, at the fitness hearing, respondent conceded that she declined to participate in the substance abuse treatment required by her service plan simply because she "[d]idn't need people to tell [her] something that [she] already knew." As such, the trial court's finding of unfitness under section 1(D)(m)(ii) of the Adoption Act is not against the

manifest weight of the evidence. See *C.N.*, 196 Ill. 2d at 221. Respondent does, however, challenge the court's finding that it would be in A.H.'s best interest to terminate her parental rights.

¶ 53    Following a finding that a parent is unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *D.T.*, 212 Ill. 2d at 352. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. The State must prove by a preponderance of the evidence that termination of parental rights is in the minor's best interest. *Id.* at 366. In making the best interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. As discussed above, we will not

disturb a court's finding that termination is in the child's best interest unless it was against the manifest weight of the evidence. *C.N.*, 196 Ill. 2d at 208.

¶ 54    We find that the trial court's finding is supported by the evidence. The court stated that it had considered all the statutory factors in coming to its decision, opining specifically on the fourth and seventh factors enumerated above. C.H. had been in the foster placement for the majority of her life. She was placed there at such a young age that the foster home very well could be the only home that she remembers. The foster family provides C.H. with a secure and stable home and meets all of her needs. C.H. is loved, and the foster parents wish to give her the permanence that she needs. Respondent could not provide permanence for C.H., as she was not scheduled to be released from prison for another three years.

¶ 55    We disagree with respondent's assertion that a major component of the trial court's best interest determination was that A.H. and C.H. were placed together. A review of the court's ruling makes it clear that, while it was placing the children together, it did not suggest that removal of one of the children would change its ruling as to the other.

> "For [C.H.] she's been in this foster home for approximately 20 months. Again, that's a child that's just now two years old as of last month, so a substantial portion of her life. And for [A.H.], she's been in the same foster home and the only home she knows since birth.
>
> There's clearly a strong bond and attachment between the minor children and the foster parents as well as the foster siblings. The court also considers that both children are in the same home as biological siblings, and leaving the children there is the least disruptive placement.
>
> The Court also considers each of the child's need for permanence. ***

[A.H.], she's been in the same home her whole life, that's all she knows. For [C.H.], practically speaking that's the only home she knows as well, too.

And they do deserve permanency, and [respondent] is going to be in the department of corrections for almost another three years, and that would be counterproductive for the children's best interest to wait another three years to have their bonding get even deeper with the foster parents, and then to rip them out of the only home they've really ever known and the only family they've ever known.

So for these reasons, along with the ten other statutory factors, the Court finds the State in each case has met its burden of proof, that it is in the best interest for both [C.H.] and [A.H.] to terminate the parental rights of [respondent]."

¶ 56    Accordingly, the trial court did not err in terminating respondent's parental rights as to C.H.

¶ 57                                III. CONCLUSION

¶ 58    For the reasons stated, we reverse the trial court's judgment terminating respondent's parental rights over A.H. in appellate case No. 4-25-0026 and remand for further proceedings. We affirm the trial court's judgment terminating respondent's parental rights over C.H. in appellate case No. 4-25-0027.

¶ 59    No. 4-25-0026, Reversed and remanded.

¶ 60    No. 4-25-0027, Affirmed.

*In re A.H.*, 2025 IL App (4th) 250026

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Logan County, Nos. 23-JA-1, 24-JA-1; the Hon. Jonathan C. Wright, Judge, presiding. |

| | |
|---|---|
| **Attorneys**<br><br>**for**<br><br>**Appellant:** | Jeff Brown, of Bloomington, for appellant. |

| | |
|---|---|
| **Attorneys**<br><br>**for**<br><br>**Appellee:** | Bradley Hauge, State's Attorney, of Lincoln (Patrick Delfino, Edward R. Psenicka, and Jenna Seaver, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |