NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251021-U

NOS. 4-25-1021, 4-25-1022 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 9, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| In re A.J. and O.J., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
|      Petitioner-Appellee, | ) | No. 24JA47 |
|      v. | ) | |
| Mario J., | ) | Honorable |
|      Respondent-Appellant). | ) | John Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment, concluding no meritorious issues could be raised on appeal.

¶ 2     On August 21, 2025, the trial court entered an order terminating the parental rights of respondent, Mario J., to his minor children, A.J. and O.J. (both born in April 2024). (The parental rights of the minors' mother, Danielle T., were also terminated, but she is not a party to this appeal.) Respondent appealed, and counsel was appointed to represent him. Appellate counsel now moves to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), contending, upon examination of the record, there are no meritorious issues to be raised on appeal that would warrant relief. See *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) ("*Anders* applies to findings of parental unfitness and termination of parental rights."). The record indicates a copy of counsel's motion and an accompanying memorandum of law were sent to respondent by mail. Respondent did not

file a response. For the following reasons, we grant counsel's motion to withdraw, and we affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4                              A. The Neglect Petition

¶ 5          In May 2024, the State filed a petition for the adjudication wardship of the minors. The petition alleged the minors were neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2024)) because they resided in an environment injurious to their welfare. The petition alleged (1) both respondent and Danielle T. had unresolved issues of domestic violence and anger management and (2) Danielle T. had previously surrendered her parental rights to another child without having been found fit. The trial court granted temporary custody to the Illinois Department of Children and Family Services (DCFS).

¶ 6          In July 2024, the minors were adjudicated neglected on the basis their environment was injurious to their welfare. In August 2024, the trial court entered a dispositional order making the minors wards of the court and placing custody of the minors with DCFS.

¶ 7          B. The Initial Petition to Terminate Parental Rights and Following Proceedings

¶ 8          On December 9, 2024, the State filed a petition to terminate respondent's parental rights, alleging he was unfit in that he failed to maintain a reasonable degree of interest, concern, or responsibility for the minors' welfare (750 ILCS 50/1(D)(b) (West 2024)).

¶ 9          The trial court held a fitness hearing on April 29, 2025. The following evidence was adduced.

¶ 10          Amanda Luebeck, a DCFS child welfare specialist, was assigned to the minors' case in May 2024. In June 2024, she prepared a service plan for respondent that required him to refrain from acts of domestic violence and criminal activity, participate in drug and alcohol screens

with negative results, maintain an income and appropriate housing, complete courses relating to domestic violence and anger management, engage in individual therapy, maintain contact with DCFS, and visit the minors.

¶ 11 Luebeck testified respondent completed an integrated assessment, during which he "downplayed" his domestic violence history. He participated in five out of six drug screenings, and each one was positive for tetrahydrocannabinol. According to Luebeck, prior to July 2024, respondent visited the minors in person on five occasions. During some visits, respondent brought a new outfit for the minors, but Luebeck could not recall any other gifts he provided.

¶ 12 In July 2024, respondent ceased contact with Luebeck. Respondent did not reestablish contact with her until October 2024, when he reached out to her from the Champaign County jail. Luebeck testified, during the period in which respondent failed to maintain contact with her, he was fully disengaged from services and visitation. As a result, when respondent was evaluated on his client service plan in November 2024, he was rated as "unsatisfactory." Luebeck acknowledged, however, after respondent reconnected with her in October 2024, he was consistent in his communication and involvement in the case to the best of his ability while in custody.

¶ 13 Respondent resumed visitation with the minors by video from jail in December 2024. These visits were scheduled weekly and initially lasted 10 minutes but were later increased to 20 minutes. Respondent missed "a few" visits due to connection issues, but Luebeck estimated respondent attended 15 to 20 visits. During the visits, respondent was happy to see the minors, would wave at them and say their names, and would express to them he was happy they were doing well. Luebeck noted, however, the minors treated the computer screen "like a television" and did not "have a frame of reference of who that person is."

¶ 14 Luebeck testified, because respondent was in custody, he could not parent the

minors or attend to them on a day-to-day basis. For example, although the minors had substantial medical needs, requiring them to attend several medical and therapy appointments, respondent was present for only one pediatric ophthalmologist visit for O.J. Additionally, respondent sent no cards or gifts to the minors for special occasions, and he did not send letters or e-mails expressing his interest, concern, or responsibility for them.

¶ 15 In April 2025, respondent was sentenced to five years' imprisonment for theft in Champaign County case No. 24-CF-1288, and he had a projected discharge date in 2027. Luebeck acknowledged respondent participated in several programs while in the Illinois Department of Corrections (DOC) relating to anger management, domestic violence, and substance abuse. However, because respondent was required to attend specific classes established by DCFS to fulfill the mandated services, respondent, upon his release, "would need to begin at class one," despite the domestic violence and parenting classes he had taken. Additionally, upon his release, respondent would need to obtain training to address the minors' complex medical needs before reunification could occur.

¶ 16 Respondent testified his last in-person visit with the minors was on July 1, 2024. His last contact with Luebeck before being taken into custody was on July 18, 2024; he was jailed on September 23, 2024. Respondent acknowledged, between July 18, 2024, and September 23, 2024, he made no effort to contact Luebeck or the minors. He claimed he ceased contact because he lost his job and home, and he feared those circumstances would hinder reunification.

¶ 17 Respondent testified he was aware the minors, especially O.J., had complex medical needs. However, he was unable to explain in any detail what those needs entailed, except that O.J. used a gastronomy tube (G-tube). While he knew the minors saw therapists and doctors, he did not know the names of any of the providers and never requested to review any of the minors'

medical records.

¶ 18    Respondent admitted he was serving a 5-year prison sentence and had previously served a total of 13 years of imprisonment as an adult from various prison sentences. While his projected release date was not until 2027, he expected he would be released earlier because he was participating in various programs while incarcerated. Even so, he acknowledged it could still be months or years after his release before reunification could occur because he would have to complete assessments, domestic violence and parenting classes, and counseling.

¶ 19    The trial court concluded the State failed to prove by clear and convincing evidence respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare. The court highlighted, *inter alia*, the evidence showed respondent was making efforts toward reunification, given he had reengaged communication with Luebeck and participated in visitation with the minors by video.

¶ 20    C. First Supplemental Petition to Terminate Parental Rights and Proceedings

¶ 21    On May 5, 2025, the State filed a first supplemental petition to terminate parental rights. Therein, the State alleged respondent was unfit in that he was depraved (750 ILCS 50/1(D)(i) (West 2024)) and failed to make reasonable progress toward the return of the minors during the nine-month period of July 9, 2024, through April 9, 2025, which followed the adjudication of neglect (*id.* § (D)(m)(ii)). The State further alleged it was in the best interest of the minors to terminate respondent's parental rights.

¶ 22                          1. *Fitness Hearing*

¶ 23    The trial court held a fitness hearing on the supplemental petition on August 21, 2025. At the hearing, the State indicated it would proceed only on the depravity allegation. Thereafter, the court took judicial notice of McLean County case No. 24-CF-104, wherein

respondent pleaded guilty in April 2024 to domestic battery and received 30 months of probation. The State also presented certified copies of respondent's convictions for the following felonies: (1) theft in April 2025 in Champaign County case No. 24-CF-1288, resulting in five years' imprisonment; (2) unlawful restraint in January 2023 in Champaign County case No. 21-CF-1443, resulting in three years' imprisonment; (3) aggravated battery in a public place in February 2020 in Champaign County case No. 20-CF-137, resulting in three years' imprisonment; (4) domestic battery in December 2019 in Champaign County case No. 19-CF-1462, resulting in 24 months' probation; and (5) aggravated battery of a peace officer in May 2013 in Champaign County case No. 13-CF-358, resulting in 30 months' probation. The State explained respondent's probation in case No. 19-CF-1462 was discharged due to his sentence in case No. 20-CF-137, and he was unsuccessfully discharged from his probation in case No. 13-CF-358 after being charged in a subsequent case.

¶ 24        Respondent did not present any new evidence regarding fitness but requested the trial court consider his testimony from the April 29, 2025, fitness hearing. Over objections from the State and guardian *ad litem*, the court permitted the consideration of respondent's prior testimony as to the issue of whether the statutory presumption of depravity was rebutted.

¶ 25        As to respondent's fitness, the trial court found a rebuttable presumption existed that respondent was depraved because he had been convicted of at least three felonies, with one occurring within five years of the filing of the petition to terminate his parental rights. However, the court determined the presumption of depravity was rebutted by respondent's testimony from the prior fitness hearing about his participation in various programs and classes while incarcerated.

¶ 26        Given the foregoing, the trial court considered "the issue of depravity as though no presumption had existed." In doing so, the court opined respondent had "a lengthy record of

criminal involvement and convictions for what the Court would consider to be significant and serious offenses." The court highlighted, in "five and a half years or so [respondent] had numerous felony offenses for which [he had] been convicted." Additionally, although respondent had "opportunities to be placed on probation," he was discharged unsuccessfully for committing other offenses. The court concluded, although respondent engaged in services while in DOC and communicated with Luebeck, the State proved by clear and convincing evidence respondent was depraved, considering the "extended period of time" in which respondent had engaged in criminal activity, including offenses against persons. Accordingly, the court found respondent was unfit.

¶ 27                                    2. *Best-Interest Hearing*

¶ 28          The trial court immediately proceeded to a best-interest hearing and took judicial notice of the entire court file.

¶ 29          Thereafter, Kristina S., the minors' foster mother, testified A.J. and O.J. came into her care in May 2024, after they were released from the hospital at birth. She is cardiopulmonary resuscitation and first-aid certified, obtained extensive developmental training, and received hospital training to manage O.J.'s G-tube.

¶ 30          Kristina provided extensive detail about the minors' medical needs. O.J. had torticollis, resulting in muscle tightening, which required weekly physical therapy. He also attended speech therapy, developmental therapy, and ongoing visits to an eye doctor to ensure normal eye development. A.J. had a bow in one of his legs and was dragging his foot, suggesting he might also need physical therapy.

¶ 31          When the minors entered Kristina's care, both had difficulties with bottle feeding because of aspiration, or the entry of liquid into their lungs. Kristina explained aspiration can cause "damage to the lungs, the throat," and it is particularly dangerous because "it's silent." An

individual, therefore, must be able to watch "very carefully" for specific signs that occur when aspiration happens to identify it. While thickening A.J.'s formula would cause him to aspirate less, it was "definitely a concern still." O.J., in turn, required the placement of a G-tube to facilitate feeding. Kristina described the process of safely conducting a G-tube feeding, which required her to place formula in a bag attached to an intravenous line, attach an infusion pump to the G-tube, and program the pump to deliver the formula at an appropriate rate, which could vary. The feeding process would then take 30 minutes, and O.J. needed to sit upright for an additional 30 minutes. Each piece of equipment then needed to be cleaned and sterilized before the next feeding.

¶ 32 According to Kristina, immediately after the surgical placement of the G-tube, she and her husband had to wake O.J. every two or three hours to tube-feed him. Kristina explained the frequency of feedings had since decreased, and O.J. no longer aspirated when eating purees or table food, but his ingestion of liquids still required the use of the G-tube.

¶ 33 Beyond O.J.'s feeding concerns, he had also been recommended to undergo neurological testing due to concerns he had cerebral palsy. Further, he displayed physical behaviors indicative of autism.

¶ 34 While A.J. was "more on track with his age," Kristina suspected he would also need physical therapy soon. A.J. was also undergoing speech therapy and seeing a speech pathologist, nutritionist, and pediatric doctor to ensure he was developing normally.

¶ 35 Kristina testified she had been involved in all the minors' medical and therapy appointments and agreed they had made consistent progress because she had been able to address their complex medical needs. Because respondent was incarcerated when O.J. had the G-tube surgically placed, respondent has never fed O.J. using the G-tube.

¶ 36 Kristina testified A.J. and O.J. had been welcomed by her family, which included

her husband, biological son, and two foster children. They were loved and treated no differently than any of Kristina's other children. She emphasized she had an amazing bond with the minors that had only become stronger, despite the medical care they needed. The minors, in turn, were "very attached" to her and her husband, and that bond had grown as they have gotten older.

¶ 37 Kristina intended to adopt A.J. and O.J. if they became available for adoption, and she believed it was in their best interest for them to remain in her home. While she intended to keep respondent and Danielle T. in the minors' lives, she believed severing the bond the minors had with her and her family would be detrimental to the minors' development, particularly in light of their medical needs. Kristina explained she had supportive friends and family who could assist in caring for the minors when needed. Finally, she emphasized her love for A.J. and O.J. and assured she would always put their needs and safety first.

¶ 38 Respondent testified he loved A.J. and O.J. and expressed his regret he was not available for them. He described the importance of keeping the minors within his family and testified about the efforts his brother from Alabama and cousin from Indiana had undertaken to obtain guardianship, albeit unsuccessfully. He also expressed his gratitude to Kristina and her family for caring for the minors but wished "this wasn't happening."

¶ 39 Respondent highlighted he was doing "everything possible" to be available for the minors by seeking opportunities in DOC that would make him eligible for work release or "get[ting] out earlier." He believed his bond with the minors had progressed, noting the minors looked forward to their video visits with him and seemed to know who he was. Respondent testified most of his criminal background occurred before the birth of the minors, and while he had committed a felony after they were born, he was committed to becoming a different person and doing what he could to care for them.

¶ 40    The trial court found it was in the best interest of A.J. and O.J. to terminate respondent's parental rights. The court highlighted, for a period of three months prior to respondent's detention, respondent had the ability to visit with and contact the minors but chose not to do so until after he was detained. Additionally, while the court acknowledged respondent's intentions to cease criminal activity and care for his children may have been genuine, respondent nevertheless had a long criminal record and chose to commit a felony offense after the birth of the minors. The court noted, because respondent was incarcerated, he could not care for the minors.

¶ 41    The trial court explained Kristina and her family, by contrast, have cared for the minors for 15 of the 16 months of the minors' lives. The court stated, during that time, Kristina and her family dedicated significant efforts to attend to the minors' unique medical needs. The court noted Kristina (1) provided the minors with food, shelter, health, and clothing; (2) developed the minors' identities; and (3) provided a sense of love and attachment for the minors. Additionally, Kristina's home provided a consistent, familiar place where their needs could be met. Finally, the court highlighted the minors needed permanency given their young age, which Kristina's family could provide.

¶ 42    This appeal followed.

¶ 43                                 II. ANALYSIS

¶ 44    On appeal, appellate counsel moves to withdraw, contending it would be frivolous to assert any argument the trial court erred in finding (1) respondent unfit or (2) it was in the best interest of the minors to terminate respondent's parental rights.

¶ 45                              A. Fitness Finding

¶ 46    Counsel argues no meritorious argument exists that the trial court erroneously found respondent was unfit.

¶ 47 The involuntary termination of parental rights involves a two-step process whereby the State must first prove by clear and convincing evidence the parent is "unfit" under one or more grounds as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re D.D.*, 2022 IL App (4th) 220257, ¶ 27; 705 ILCS 405/2-29(2) (West 2024). If the trial court finds the parent is unfit, the matter proceeds to the second step, whereby the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *D.D.*, 2022 IL App (4th) 220257, ¶ 27.

¶ 48 Under section 1(D)(i) of the Adoption Act, a person can be deemed unfit where the trial court determines the individual is depraved. 750 ILCS 50/1(D)(i) (West 2024). Depravity is defined as "an inherent deficiency of moral sense and rectitude." (Internal quotation marks omitted.) *In re Abdullah*, 85 Ill. 2d 300, 305 (1981). "Depravity must be shown to exist at the time of the petition to terminate parental rights." *In re A.M.*, 358 Ill. App. 3d 247, 253 (2005). "[T]he acts constituting depravity *** must be of sufficient duration and of sufficient repetition to establish a deficiency in moral sense and either an inability or an unwillingness to conform to accepted morality." (Internal quotation marks omitted.) *Id.*

¶ 49 Section (1)(D)(i) provides a rebuttable presumption that a parent is depraved "if the parent has been criminally convicted of at least 3 felonies under the laws of this State *** and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights." 750 ILCS 50/1(D)(i) (West 2024). A rebuttable presumption results in a *prima facie* case as to the issue in question and effectively requires the party against whom it applies to present evidence to meet the presumption. *In re J.A.*, 316 Ill. App. 3d 553, 562 (2000). Once that party presents evidence rebutting the presumption, the presumption ceases to operate, and the issue must be decided on the evidence adduced as if no presumption

- 11 -

ever existed. *Id.*

¶ 50       For purposes of section (1)(D)(i), "[c]ertified copies of the requisite convictions create a *prima facie* showing of depravity, which shifts the burden to the parent to show by clear and convincing evidence that he is, in fact, not depraved." *In re A.H.*, 359 Ill. App. 3d 173, 180 (2005). Because the presumption is rebuttable, the parent may still present evidence showing that, despite the prior convictions, he or she is not depraved. *Id.*

¶ 51       "The statutory ground of depravity requires the trier of fact to closely scrutinize the character and credibility of the parent and the reviewing court will give such a determination deferential treatment." *J.A.*, 316 Ill. App. 3d at 563. We will not disturb the trial court's determination of whether a person is unfit unless the court's findings are against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite result, such that no reasonable person would arrive at the court's finding based upon the evidence in the record. *Id.*

¶ 52       Here, the State presented as evidence certified copies of respondent's felony convictions for (1) theft in 2025, (2) unlawful restraint in 2023, (3) aggravated battery in 2020, (4) domestic battery in 2019, and (5) aggravated battery of a peace officer in 2013. Because this evidence established respondent had three or more felonies, with one occurring within five years of May 5, 2025, the filing of the first supplemental petition to terminate his parental rights, the State presented evidence sufficient to raise a rebuttable presumption respondent was depraved. To rebut that presumption, respondent presented as evidence his testimony from the April 29, 2025, fitness hearing, wherein he explained he reestablished contact with Luebeck after being jailed; consistently attended video visits with the minors; and attended domestic violence, parenting, and substance abuse programs while incarcerated to improve himself. The trial court explicitly found

- 12 -

this evidence rebutted the presumption of depravity.

¶ 53    Nevertheless, the trial court found, even without the presumption, the State still proved by clear and convincing evidence respondent was depraved based upon his "lengthy" criminal record involving serious felony offenses. We discern no error. A claim of depravity can be defeated where a parent shows, upon leaving prison, she maintains a lifestyle suitable for parenting children safely. *In re J.V.*, 2018 IL App (1st) 171766, ¶ 183. Respondent made no such showing here. Instead, the evidence established respondent engaged in a repeated pattern of criminal activity, resulting in his accumulation of felony convictions for more than a decade. He served multiple prison sentences in DOC and violated probation on several occasions, which resulted in his return to DOC. Respondent acknowledged he spent approximately 13 years of his adult life in DOC, and the evidence showed he even committed an offense after the minors were born, such that he was incarcerated for the vast majority of the minors' lives. See *In re T.S. III*, 312 Ill. App. 3d 875, 878 (2000) (concluding, although the respondent testified he would change when he was released from prison because his child needed him, the court's finding the respondent was depraved was not against the manifest weight of the evidence where the evidence established the respondent had six felony convictions and continued to commit crimes, despite having other children who needed him). Considering this evidence, we conclude the court's determination respondent was depraved was reasonable, such that its finding respondent was unfit was not against the manifest weight of the evidence. Accordingly, we agree with appellate counsel no meritorious argument can be raised challenging the trial court's finding respondent was unfit.

¶ 54                                    B. Best-Interest Determination

¶ 55    Appellate counsel also argues he can make no meritorious argument the trial court's best-interest finding was against the manifest weight of the evidence.

¶ 56 After the trial court finds a parent to be unfit, the focus shifts to the child, and the issue becomes whether, in light of the child's needs, parental rights should be terminated. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.*

¶ 57 The State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *D.D.*, 2022 IL App (4th) 220257, ¶ 27. In making a best-interest determination, the trial court must consider, in the context of the child's age and developmental needs:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child.' " *In re A.H.*, 2025 IL App (4th) 250026, ¶ 53 (quoting *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009)).

See 705 ILCS 405/1-3(4.05) (West 2024). In making a best-interest determination, the court need not explicitly reference each of the foregoing factors, and a reviewing court need not rely on any basis used by the court below in affirming its decision. *A.H.*, 2025 IL App (4th) 250026, ¶ 53. We will not disturb a court's finding that termination is in the child's best interest unless it was against the manifest weight of the evidence. *In re Al. P.*, 2017 IL App (4th) 170435, ¶ 61. "A best interest

- 14 -

determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result." *Id.*

¶ 58 Here, evidence was presented the minors are in a stable, loving home where their needs are being met. Kristina and her family have provided the minors with safety, affection, and care since they were born, and she expressed her desire to provide continued stability for them through adoption. The evidence showed the minors, in turn, are affectionate toward and bonded to Kristina and her family, and that bond has grown as the minors have gotten older. Notably, Kristina has provided exemplary efforts to attend to the minors' unique medical needs and ensure they receive the care they require, and she noted her determination to continue putting their needs and safety first.

¶ 59 We acknowledge the evidence clearly establishes respondent loves A.J. and O.J. and has engaged in noteworthy efforts to better himself while in DOC. However, he is unable to provide the stability and care the minors need while he remains incarcerated, and he acknowledged, even upon his release, it could be months or years before reunification could occur. The trial court ultimately determined the minors needed permanency and stability, which Kristina's family could provide. The evidence supports that determination. Accordingly, the court's finding it was in the minors' best interest to terminate respondent's parental rights was not unreasonable, and thus, it was not against the manifest weight of the evidence. We therefore agree with appellate counsel that any argument contesting the court's best-interest finding would be meritless.

¶ 60 III. CONCLUSION

¶ 61 For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 62 Affirmed.