2026 IL App (1st) 251567

FIFTH DIVISION
May 15, 2026

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

No. 1-25-1567

| | | |
|---|---|---|
| *In re* A.B., a Minor, | ) | |
| | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | No. 19 JA 00851 |
| v. | ) | |
| | ) | Honorable |
| G.J. | ) | Tracie Porter, |
| | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices McBride concurred in the judgment and opinion.
Justice Ellis dissented, with opinion.

**OPINION**

¶ 1    This case raises a difficult question for a child protection case: How should the court and

parties proceed where the identity of the father is not discovered until after the child has been in

foster care for many years and the goal for the child has already been established as the termination

of parental rights? While we agree with the point raised in the well-argued brief filed by the father's

attorneys—that the court cannot simply ignore the emergence of a previously undiscovered

parent—we also agree with the State that, in this case, there was at least one clear basis on which

to terminate the father's rights that was unaffected by his late identification. We therefore affirm

the termination decision of the circuit court.

¶ 2                              I. BACKGROUND

¶ 3     On May 10, 2019, the mother in this case, T.B., who is not a party to this appeal, gave birth to A.B. On August 6, 2019, the State filed a petition for adjudication of wardship. The supporting facts were that T.B. had left her foster care placement, taking her newborn with her, and had since then participated in high-risk behavior while on the run, including prostitution.

¶ 4                   A. Adjudication, Paternity Search, and Permanency Goals

¶ 5     At the adjudication hearing on June 21, 2022, the court found A.B. to be neglected due to an injurious environment, and, at the dispositional hearing on February 17, 2023, T.B. was found unable to care for her. A.B. was placed in the custody of the Department of Children and Family Services (DCFS) guardianship administrator, with the goal of returning her home.

¶ 6     Throughout the case, T.B. struggled to meet the DCFS service plans and complete the recommended courses and treatments. In April 2023, during a supervised visit with her daughter, T.B. and her paramour took A.B. from the visitation center without permission. Chicago police were notified and issued an Amber Alert. The court issued a child-protection warrant a few days later, and the authorities ultimately found A.B. and returned her to her foster mother.

¶ 7     In January 2024, the goal for A.B. was changed to substitute care pending termination of parental rights. At that point, no one had been determined to be A. B.'s father, and T.B. was clearly not making progress towards regaining custody of A.B..

¶ 8     The first putative father identified was a man named L.B. A few months later, another possible father, B.M., was named. In December 2019, DNA testing excluded both L.B. and B.M. as A.B.'s biological father. That same date, the circuit court ordered a third man, K.D., be tested to see if he was A.B.'s father. But a few months later, the DNA test came back and ruled him out

as well. DCFS continued trying to identify A.B.'s father, searching its Diligent Search Service Center and the Illinois Putative Father Registry. On September 8, 2020, and again on January 5, 2021, the court ordered a paternity test for a man identified as T.R. On April 2021, he too was ruled out by DNA testing. On August 11, 2023, a man identified as J.H. was ordered tested and also subsequently ruled out as A.B.'s father on May 14, 2024. A sixth man, I.M., was also identified, but he died before he could be tested.

¶ 9    In the summer of 2024, T.B. told Breanna Woodard, the DCFS caseworker assigned to the case, that G.J., the father who is the appellant in this case, might be her daughter's father. In August 2024, Ms. Woodard filed a report with the court listing G.J. as a putative father for the first time and noting that G.J. was incarcerated in Pinckneyville Correctional Center. In October, the court appointed an attorney to represent G.J. and ordered him to submit to DNA testing. That test came back positive on January 28, 2025.

¶ 10    Over a month earlier, on December 17, 2024, with the goal having been changed to termination of parental rights, the State had filed a supplemental petition for the appointment of a guardian with the right to consent to A.B.'s adoption. At that point, G.J. had been identified as a possible father but the DNA test had not yet come back. The supplemental petition listed him as a putative father, along with I.M., the previously listed and deceased putative father.

¶ 11    After G.J.'s paternity was confirmed, the State amended its supplemental petition, alleging that G.J. was an unfit parent based on the following grounds under the Adoption Act: (1) failure to maintain a reasonable degree of interest, concern, or responsibility for the child's welfare; (2) depravity; (3) inability, by reason of incarceration in excess of two years, to discharge his parental responsibilities; and (4) inability, by reason of repeated incarceration, to discharge his

parental responsibilities. See 750 ILCS 50/1(D)(b), (i), (r), (s) (West 2024).

¶ 12                                    B. Unfitness Hearing

¶ 13    On July 14, 2025, the court held a hearing on the State's termination petition. G.J. attended via video from Pinckneyville. T.B. was absent. At the unfitness hearing, the State offered exhibits and the testimony of Ms. Woodard, the DCFS case worker. G.J. also testified on his own behalf.

¶ 14    Ms. Woodard had been the assigned case worker since March 2023. In that time, she had attempted to work with T.B. to determine the identity of A.B.'s father. After T.B. had identified G.J. as a possible father in 2024, Ms. Woodard found that he was in IDOC custody at Pinckneyville. She first reached out to him in December 2024, when a DNA paternity test was pending, though she could not recall their discussion.

¶ 15    Ms. Woodard next spoke to G.J. on February 18, 2025. She gave G.J. a brief overview of the case, and he told her that he wanted to be a father to A.B.. Although Ms. Woodard believed that G.J. would need to complete various services and treatments, DCFS does not provide services for individuals in IDOC custody. Ms. Woodard did not inquire if IDOC offered any services of which G.J. could avail himself. Once he was released, Ms. Woodard said that G.J. would need individual therapy, parenting classes, domestic-violence classes, and substance-abuse treatment.

¶ 16    On cross-examination, Ms. Woodard acknowledged both that she did not actually assess G.J. for services and that she recited those particular services because they are the ones recommended for every parent with an open DCFS case.. Ms. Woodard also acknowledged that she made no attempt to introduce A.B. to her father.

¶ 17    Ms. Woodard testified that A.B. could not be put into the custody of her father: "Because the case has been on since 2019. The father was just recently identified. And the youth does not

have a relationship or a bond with the father." Ms. Woodard also testified that a child would not be able to reside in an IDOC facility. Ms. Woodard testified that she had told G.J. how he could send things to A. B. and he had in fact sent her "numerous" cards and two pillows that he had created with her name embroidered on them.

¶ 18    The State entered into evidence certified copies of six of G. J.'s felony convictions listing the sentences he received in each case. Those include: possession of a controlled substance in January 10, 2010 (three years); being a felon in possession of a firearm in 2012 (three years); escape from electronic monitoring in 2015 (two years); possession of a controlled substance in 2017 (two years); unlawful use of a weapon in 2020 (ten years); and unlawful use of a weapon in 2022 (seven years).

¶ 19    This documentary evidence was supplemented by G.J.'s own testimony regarding his most recent incarcerations, in which he explained that he had been at Pinckneyville continuously since March of 2021. Before that he was incarcerated in Cook County Jail for four or five months in 2019 and bonded out in November of 2019. He skipped court in February 2020 and was then reincarcerated in May of 2020. He has remained in custody since that date.

¶ 20    G.J. testified on his own behalf at the unfitness hearing. He said that he first learned that he might be A.B.'s father when DCFS sent him a letter in late 2024. He admitted that he had contact with T.B. occasionally before he went to prison in 2020, but he did not know that she had given birth to a child. Although G.J. and T.B. had lived in the same house for a period, when she was a foster child in his mother's home, G.J. testified, without contradiction, that he did not know he was A.B.'s father or even that T.B. was pregnant.

¶ 21    G.J. testified that he "absolutely" wanted to visit with A.B. and introduce himself to her,

but that he could not set up visits with his daughter from inside prison without outside help. He testified that Ms. Woodard had said she would try to help him with this, but he was never able to meet A.B. in person.

¶ 22    He also testified that "the minute" he had obtained an address to do so, he had sent A.B. letters and gifts. He estimated that he sent her approximately ten letters in five months, including birthday cards and some gifts he had made after her birthday. G.J. said that he would "absolutely" be willing to do any services necessary to be reunified with A.B.

¶ 23    In closing argument, the State argued that the certified copies of G.J.'s convictions created a presumption of depravity that G.J. had presented no evidence to rebut. As to the repeated-incarceration ground, the State's argument was that "his repeated incarceration has not allowed him to fulfil his parental duties."

¶ 24    The court found both T.B. and G.J. unfit to parent A.B. The court refused to find that G.J. had failed to maintain a reasonable degree of interest for the child's welfare, stating: "though [G.J.] is incarcerated, he has shown some interest, albeit much later in the case, and that's because the natural mother was identifying several other individuals before a finding of paternity established that [G.J.] was the father."

¶ 25    The court also found that the State did not prove ground (r), that incarceration for a two-year period beginning with the termination petition would prevent G.J. from discharging his parental responsibility, again noting that G.J. "only found out that [A.B.] was his child in January of 2025. And since then, it appears he's been making contact by sending letters, gifts, and cards to [A.B.]."

¶ 26    The court did find G.J. unfit due to repeated incarceration, under ground (s). The court's

reasoning and its colloquy with G.J. was as follows:

"And again, [G.J.'s] currently incarcerated and his release date is not set until April of 2030.

In addition, the Court finds by clear and convincing evidence—

FATHER: I get out next year.

THE COURT: Finds that Ground S for repeated incarcerations. Ground S sets forth that a child who is in temporary—who is in guardianship with DCFS and the parents with repeated incarceration for criminal behavior prevents the parent from being able to care for his child.

[G.J.] cannot care for his child while he's incarcerated. And even if he's released before April of 2030 for any reason, at this time he cannot care for his child who is in need of immediate care for her safety, welfare, and protection."

¶ 27   The court also found G.J. unfit based on depravity, under ground (i), because of his numerous qualifying felony convictions.

¶ 28                        III. Best-Interests Hearing

¶ 29   The parties immediately proceeded to a best-interests hearing. G.J. had left the screen while appearing via Zoom but was summoned back. When he returned, he expressed his frustration to the court:

"[FATHER]: Can you hear me?

THE COURT: Yes. We can hear you [ ].

[FATHER]: I mean, I thought I was done. You terminated my rights. I get out next year. I'm trying to figure out what we're doing. I don't get out in [20]30 – five or ten

7

years from now. I get out next year. I'm doing everything. I'm not on child support. I support my kids to the best of my ability.

***

[FATHER]: I didn't have nothing. I couldn't say nothing. This is ridiculous. I'm in here progressing to the point I got my certificate—"

¶ 30    The court reminded G.J. that he was represented by counsel and started the best-interests hearing. A.B.'s foster mother testified. She said that she knew the family because her brother had once dated A.B.'s mother. A.B. had lived with her since September 2019, when A.B. was an infant. She also cared for two other foster children. A.B. did not have a father figure in the foster mother's home. A.B. called the foster mother "mom or mommy" and had integrated well into the foster's mother's extended family and community.

¶ 31    G.J. testified again. He said that his current release date (as of the day of the hearing) was in January 2027, but that he was working at the prison and also taking college courses, which likely would reduce his release date further. The Illinois Department of Corrections now projects G.J.'s release from prison on May 8, 2026, followed by a 3-year term of mandatory supervised release. https://idoc.illinois.gov/offender/inmatesearch.html (last visited May 8, 2026). See *People v. Ware*, 2014 IL App (1st) 120485, ¶ 29 (appellate court may take judicial notice of the IDOC website.).

¶ 32    G.J. was adamant that it was not in A.B.'s best interest for his parental rights to be terminated. He admitted that he had had "problems in the street." But as far as him being a parent, he said, "I have always been there for my kids. I just had to get this part corrected." G.J. also said that he hoped A.B. could meet his other children—an older sister and two older brothers, with

8

whom G.J. was in "consistent contact" and saw regularly while in prison. He assured the court that, upon release, he could be a strong father figure for A.B. His fiancée had stood by him, and they planned to live in a house in Portage Park, a neighborhood with good schools.

¶ 33 On July 28, 2025, the court announced its ruling. It found that terminating both parent's rights was "necessary for the minor to receive permanency in this case." The court noted that A.B. was doing well with her foster mother, who was willing to provide permanency through adoption. G.J. now appeals.

¶ 34                           II. JURISDICTION

¶ 35 The trial court terminated G.J.'s parental rights on July 28, 2025, and G.J. timely filed his notice of appeal on August 13, 2025. We have jurisdiction over this appeal pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments in civil cases, and 660 (eff. Oct. 1, 2001), governing appeals in cases arising under the Juvenile Court Act.

¶ 36                            III. ANALYSIS

¶ 37 The involuntary termination of parental rights pursuant to the Juvenile Court Act involves a two-step process. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). There must first be a threshold showing, based on clear and convincing evidence, that the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *Id.* Only where a showing of unfitness has been made does "the court then consider[ ] whether it is in the best interests of the child that parental rights be terminated." *Id.* The reason for the heightened standard of proof in unfitness cases is that the interests of parents in the care, custody, and control of their children is " 'perhaps the oldest of the fundamental liberty interests[.]' " *In re M.H.*, 196 Ill. 2d 356, 362 (2001) (quoting

*Troxel v. Granville*, 530 U.S. 57, 65 (2000)).

¶ 38    "Although section 1(D) of the Adoption Act sets forth numerous grounds under which a parent may be deemed 'unfit,' any *one* ground, properly proven, is sufficient to enter a finding of unfitness." (Emphasis in original.) *In re C.W.* 199 Ill 2d at 210. A finding of unfitness will not be reversed unless it is against the manifest weight of the evidence, such that the opposite conclusion is clearly apparent. *In re M.I.*, 2016 IL 120232, ¶ 21.

¶ 39    Typically, a case begins in juvenile court when a child is taken into temporary custody by the police or DCFS. 705 ILCS 405/2-5, 2-6, 2-7 (West 2022). A petition for an adjudication of wardship is filed and a summons issued. *Id.* §§ 2-13, 2-15. A petition for wardship will be granted where the court determines that the minor's parents are "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so" and "the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of [the minor's] parents, guardian or custodian." *Id.* § 2-27(1).

¶ 40    The court then hears evidence regarding what disposition will best serve "the health, safety and interests of the minor and the public." *Id.* § 2-22(1). A common disposition, and the one ordered in this case with respect to A.B., is for the minor to be made a ward of the court and DCFS given the authority to place the minor in foster care. *Id.* §§ 2-23(1)(a)(2), 2-27(1)(d). A.B. has been in the same foster placement since September of 2019. Indeed, she was placed there following temporary custody and long before the adjudication trial.

¶ 41    A dispositional order does not terminate parental rights. Rather, the purpose of the dispositional order is to "give the parents fair notice of what they must do to retain their rights to their child." *In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000). The Juvenile Court Act expressly

provides that, upon making a minor a ward of the court, the court must admonish the minor's parents regarding what they must do if they wish to retain their parental rights. *Id.* (citing 705 ILCS 405/2-22(6) (West 1998)).

¶ 42    Following the dispositional order, the court holds a series of permanency hearings and enters permanency orders designed to facilitate the goal of achieving permanency for the child. At the outset of the case, the goal is generally to return the child to the parents and the services provided are designed to achieve that. See 705 ILCS 405/2-28(2.3) (West 2022) (if another permanency goal is selected, the court must explain in writing why the goal of return home was ruled out). Under the Juvenile Court Act, once the goal is no longer return home, DCFS "shall not provide further reunification services." *Id.*

¶ 43    G.J. complains on appeal that DCFS "did not engage with [G.J.] .in any manner before his parental rights were terminated." He is correct. By the time that DCFS and the court were aware that G.J. was A.B.'s father, the goal for achieving a permanent home for A.B. was no longer to return her to her parents. Rather, the goal was to terminate her parents' rights and free her to be adopted by the foster mother that had cared for her since she was four months old. While this made sense in terms of what was best for A.B., we agree with G.J. that the "procedural status" of the case should not be determinative of his right to be a parent.

¶ 44    This case illustrates the need to determine paternity promptly when a case comes in. In this case, G.J. was not even identified as her father until A.B. was five years old. Simultaneous and quickly administered paternity tests, a robust investigation, and whatever other measures are possible should be employed. A delayed determination of paternity is not in the best interests of the child or fair to the parents.

11

¶ 45     In some cases, the discovery of a parent after the goal has changed to termination of parental rights could require the court to consider changing the goal back to return home to allow the newly discovered parent to engage in services and have regular visitation with their child. Where there is no independent basis on which to terminate parental rights and the only reason that the State is seeking to do so is that the parent has been absent from the life of a child that they did not know existed, the circumstances would certainly constitute a uniquely difficult problem implicating a number of competing considerations.

¶ 46     But that is not this case. G.J. was found unfit on two separate grounds: repeated incarceration and depravity. Either ground alone can sustain a finding of unfitness. *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). Without considering the more complicated "depravity" ground, it is clear to us that G.J.'s repeated incarceration is a basis on which the court's termination decision can and should be affirmed.

¶ 47     Subsection (s) of section (1)(D) of the Adoption Act provides that a parent may be found unfit if:

> "[t]he child is in the temporary custody or guardianship of the Department of Children and Family Services, the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1(D)(s) (West 2024).

¶ 48     The State must prove each of these four elements. G.J.'s only argument here is that the evidence did not show that his repeated incarceration prevented him from discharging his parental

responsibilities. He stresses that our supreme court has said that "repeated incarceration alone will not support a finding that a parent is unfit," as ground (s) "specifically requires an additional showing that the repeated incarceration has prevented the parent from discharging his or her parental responsibilities." *In re Gwynne P.*, 215 Ill. 2d at 355. However, the circuit court's factual determination that G.J.'s repeated incarceration prevented him from discharging those responsibilities was not against the manifest weight of the evidence. See *In re M.I.*, 2016 IL 120232, ¶ 21 (an unfitness finding is only reversed where against the manifest weight of the evidence).

¶ 49    In assessing whether incarceration will or has prevented a parent from discharging his or her parental responsibilities, our supreme court has instructed courts to consider the "period beginning when the person went to jail and continuing until the time the termination hearing is conducted." *Id.* at 358. The supreme court directed the circuit courts to consider "incarceration that predates the child's birth *** if it has impeded a parent's ability to acquire appropriate life skills or to provide the types of physical, mental, moral, material and emotional support children require." *Id.* at 356.

¶ 50    G.J. was incarcerated for almost the entirety of A.B.'s life, including from May 2020 until the July 14, 2025, termination hearing. In addition, he was in custody for most of the ten years before she was born. While we might assume that these many years in prison made it difficult for G.J. to acquire the necessary life skills to appropriately parent A.B., we do not need to make such assumptions. The evidence was uncontradicted that G.J. could not, from prison, provide A.B. with the physical and material support that children require from their parents. Ms. Woodard testified, and common sense tells us, that G.J. could not have a child with him in prison. In his own

testimony, G.J. never suggested that he could do so, or that he was providing material support for any of his other three children.

¶ 51    Unlike many of the grounds for unfitness, ground (s) is not dependent on a parent knowing that they have a child in need of care, since the courts are directed to consider periods of time before a child is even born. This is in contrast, for example, to ground (b), "failure to maintain a reasonable degree of interest, concern or responsibility for the child's welfare," (750 ILCS 50/1(D)(b)) which was a ground that the State included in its petition and the court refused to find had been satisfied.  Ground (s) is also different in this respect from the commonly relied-upon ground (m), under which a parent will be found unfit if they fail to make either reasonable effort or reasonable progress to correct the conditions that required the child to be placed in care within a set period of time. *Id.* at (D)(m).

¶ 52    Our supreme court's conclusion in *Gwynne* is equally applicable here. The mother in that case, like G.J. here, had made progress in addressing her own problems while in custody and expressed a strong desire to parent her child. *Id.* at 347, 363. Our supreme court concluded that termination of her parental rights under ground (s) was nevertheless appropriate because "there was ample basis to conclude that [her] repeated incarceration prevented her from meeting her financial responsibilities towards [her daughter], just as it has prevented her from meeting the other obligations she owe[d] as [the child's] mother." *Id.* at 362-63. Similarly, in this case it is apparent that G.J. would not have been able at any time during A.B.'s life to provide her with a home. In short, while repeated incarceration alone is an insufficient basis to terminate parental rights, where that incarceration covers such an extensive period of time—in this case, almost every moment of the child's life—it is obvious that a parent could not have provided housing, food and necessities

for his or her child.

¶ 53    G.J.'s only argument on best interests is that he was not properly found to be unfit. For the reasons set forth above, we disagree. He acknowledges that A.B. is in a healthy and supportive foster placement. Nothing in this court's ruling precludes her foster mother from allowing G.J. to be part of A.B.'s future. However, given that there was a clear basis for terminating his parental rights, there can be no question that it is in her best interests to free her for adoption.

¶ 54                                    IV. CONCLUSION

¶ 55    For all of the above reasons, we affirm the trial court's order terminating G.J.'s parental rights to A.B.

¶ 56    Affirmed.

¶ 57    Ellis, J., dissenting.

¶ 58    The father here, G.J., must have felt like a character in a Kafka novel. In the same breath, he's told that he is the father of a young girl and that his rights are being terminated because he is an unfit parent. There is no doubt—none—that the State made up its mind to terminate G.J.'s parental rights before anyone from DCFS had even met him. The State had the termination petition ready to go before G.J.'s paternity was even confirmed.

¶ 59    That explains why the State made no effort—none—to evaluate G.J. or to even let him speak with his daughter. The State's witness admitted as much; she didn't want the girl to meet G.J. because she had lived six years without knowing him, and it would be a shock for her to meet him now. That also explains why the State worked up no file—none—on G.J. The State didn't want to know him; it had already decided that it was best for his daughter to be adopted by her foster mother. G.J's discovery at this late juncture was nothing but a petty inconvenience.

¶ 60     I understand why the State wants the child to be adopted by the foster mother. It seems like a wonderful outcome for the child. I am as happy as anyone for this young girl.

¶ 61     But I am not happy for the rule of law. The State engineered the result it preferred, and the trial court let it happen. We know almost nothing about G.J. other than his multiple incarcerations. The State didn't even know G.J.'s release date from prison; its calculation was off by nearly *four years*. Compare that to other repeated-incarceration cases, which contained specific details about the respondent parents' lives and behavior and their interactions with their children. See *In re Gwynne P.*, 215 Ill. 2d 340, 348, 356 (2005); *In re D.D.*, 196 Ill. 2d 405, 411-12, 421 (2001).

¶ 62     We learned from G.J. at the hearing, for example, that he has other children. What kind of a father has he been to them? Wouldn't that have been an important thing to know? Had the State conducted a proper investigation, we might. But nobody bothered to even inquire.

¶ 63     I have never encountered a parental-termination case where the State performed no investigation into the parent before seeking termination. I would have believed it unthinkable before this case.

¶ 64     The Supreme Court has long required that states clear a hurdle of *at least* clear and convincing evidence of unfitness to prevent the government from cavalierly breaking parental bonds. *Santosky v. Kramer*, 455 U.S. 745, 769-70 (1982); see *In re J.J.*, 201 Ill. 2d 236, 247 (2002). That's why we consistently remind trial courts that the finding of unfitness must be made first, before reaching the question of the child's best interests. *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990). Simply put, " 'whether the child's eventual adoption *** would improve [her] future financial, social, and emotional atmosphere is not relevant in judging the fitness of the natural parent.' " *In re A.H.*, 2025 IL App (4th) 250026, ¶ 49 (quoting *Syck*, 138 Ill. 2d at 276).

¶ 65    It's easy to say that here, the father didn't know he was a father until recently, so how bad can we feel for him? It's not like he's been fighting for this child for years. Yes, this case is quite unique. But that shouldn't matter. This parent is just as entitled to his constitutional rights as any other parent. If the rule of law does not apply to everyone, then it's not a rule of law at all; it's just something we apply when we like it and discard when we don't. That road leads to dangerous places.

¶ 66    I have no idea what the outcome would have been at a proper hearing. I only know that we did not witness one below. I would vacate the judgment and remand for a new hearing after the State conducts a proper investigation and bares it in full to the court.

---

***In re A.B.*, 2026 IL App (1st) 251567**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-JA-00851; the Hon. Tracie Porter, Judge presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | John W. Whitcomb, of Monahan Law Group, LLC, of Chicago (Joseph C.F. Willuweit and Joseph T. Monahan, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Marv Raidbard, of Skokie, for other appellee. |